28 C.C.P.A.(Patents)

## KEAR v. RODER.
### Patent Appeal No. 4375.
Court of Customs and Patent Appeals.

Dec. 9, 1940.

Rehearing Denied Feb. 3, 1941.

J. F. Mothershead, of Washington, D. C. (Paul P. Stoutenburgh and Samuel Scrivener, Jr., both of Washington, D. C., of counsel), for appellant.

Harry E. Dunham, of Schenectady, N. Y. (Merton D. Morse, of Schenectady, N. Y., and A. D. Salinger, of Boston, Mass., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

LENROOT, Associate Judge.

This appeal brings before us for review a decision of the Board of Appeals of the United States Patent Office in an interference proceeding awarding to appellee Roder priority of invention with respect to all of the counts forming the issue of the interference. This decision of the board reversed the decision of the Examiner of Interferences, who had awarded priority as to all counts to the party Kear.

The issue consists of four counts, of which count 1 is illustrative and reads as

follows: "1. The combination, in a directive radiation system, comprising a plurality of spaced radiators, of means to maintain constant the field pattern produced by said radiators, said means comprising a common source of oscillations, transmission lines extending from said common source to each of said radiators, and means continuously effective to maintain the current in each radiator in constant phase relation with respect to the voltage produced by said source."

The interference arises between an application of appellant Kear, Serial No. 696,209, filed November 1, 1933, and an application of appellee Roder, Serial No. 668,595, filed April 29, 1933. The party Kear, being the junior party, has the burden of proving priority of invention by a preponderance of the evidence.

As originally declared the interference contained five counts. Subsequently each of the parties hereto filed motions to dissolve the interference, and in addition appellant Kear filed a motion to add four new proposed counts under Rule 109. In proceedings dealing with these motions all of the original counts except count 2 were eliminated from the interference and Kear's proposed 7th, 8th and 9th counts were added thereto. These four counts were renumbered 1, 2, 3 and 4 and are the counts before us.

Appellant took testimony to establish priority of invention, while appellee relied upon his filing date, April 29, 1933.

The invention in issue relates principally to radio beacons as used for the guidance of airplanes, and specifically to the type using four antennae, one at each of the four corners of a square. Each pair of diagonally opposite antennae are connected to the same transmitter, but the antennae constituting such pair are energized in opposite phase relation. The space pattern resulting from such a condition is in the form of a figure 8, and the axis of the figure 8 pattern resulting from one pair of diagonally opposite antennae intersects the axis of the pattern resulting from the remaining pair of diagonally opposite antennae at right angles. There thus result four separate courses from such a system of radiators or antennae, such courses bisecting the angles between adjacent antennae. In order for these courses to remain fixed geographically, it is essential that the phase relation and amplitude of the currents energizing the separate antennae be main-

tained in a fixed relation to the voltage impressed, and accordingly the phase relation of the various antennae currents with respect to each other is maintained. It appears that there are a number of variables, such as weather conditions, which operate to disturb this relation, and the object of the invention here in issue is to provide means whereby to counteract the effect of such variables so that the desired phase conditions may be maintained in the antennae regardless of such influences.

Appellant seeks to accomplish this by using transmission lines between each of his antennae and the source of supply which are 90° or 180° in electrical length, it appearing that the current in the end of such a transmission line is automatically maintained in constant phase and amplitude.

Appellee's approach to the solution of this problem involves the use of transmission lines of no necessarily fixed electrical length; his method is to detune each antenna so that the current in such antenna is displaced from the voltage induced in the antenna by an amount equal to the electrical length of the transmission line supplying such antenna with energy, it being our understanding that by such a method the phase relation of the current in the various antennae can likewise be maintained constant.

It may be added that in such systems of radio beacons, the radiation produced by one pair of diagonally opposite antennae is modulated to be distinguishable from the radiation emanating from the other pair of antennae, and that, when the system is properly adjusted, at points along a line midway of the axes of the separate figure 8 patterns the signals from the separate antennae will be received with equal intensity, such line constituting the equi-signal zone.

Apparently both parties filed preliminary statements, but only the statement of appellant is contained in the record. As hereinbefore stated, appellant took testimony while appellee did not. Appellee, being the senior party, relies upon his filing date, April 29, 1933, for conception and constructive reduction to practice of the invention.

The examiner awarded priority to appellant, holding that he had established conception of the invention at least as early as July 1, 1932, and actual reduction to practice as early as October, 1932.

Upon review of this decision the Board of Appeals reversed the decision of the Examiner of Interferences and awarded priority of invention to appellee. In arriving at this decision the board did not question the finding of the Examiner of Interferences ·that appellant was entitled to a date as early as July 1932 for conception of the invention, but held that appellant had not established reduction to practice prior to appellee's filing date, and had not established diligence in reducing the invention to practice.

From this decision appellant took the appeal before us.

■ At the outset we would observe that before the Patent Office tribunals it was claimed that appellee derived the invention from appellant. Both the Examiner of Interferences and the Board of Appeals decided this question adversely to appellant, and as this question is not raised by appellant's reasons of appeal, nor argued in his brief before us, it will not be considered by us.

In appellant's brief it is stated:

"The only ground upon which the Board of Appeals reversed the Examiner of Interferences is contained in the following quotation from their decision of August 9, 1939, (r. p. 259) as follows:

" 'The party Kear and perhaps the witness Diamond may have been fully convinced that the system would necessarily function properly in actual operation and it may be that the information that they possessed justified this belief. We are of the opinion, however, that the record does not clearly show what would occur in actual use. It is believed, in a system of the type here under consideration, conditions may be such in actual operation as to render substantially useless a system which may have been found entirely satisfactory under test conditions which were of a somewhat different nature.' "

This statement of appellant is inaccurate in that the board also reversed the decision of the examiner upon another ground, viz., that the testimony of appellant respecting certain tests relied upon for reduction to practice was not sufficiently corroborated.

It appears from the evidence that appellant is an electrical engineer of high standing, and that in 1932 he was employed in the National Bureau of Standards, Aeronautics Research Division; that under the direction of one Harry Diamond, who was in charge of a group working on the development of radio aids to air navigation, appellant in 1932 undertook a study of the subject matter of the involved invention, much of which consisted of preliminary mathematical investigations; that he conducted many experiments at a laboratory maintained by the Bureau of Standards at College Park, Maryland; that by the latter part of June, 1932, he had conceived the involved invention and had disclosed it to said Diamond. Appellant's testimony in this regard was clearly corroborated by Diamond. Immediately thereafter, construction of certain equipment to test the invention was begun, and one Harold Horsman, a mechanic employed at said laboratory, was assigned to do the mechanical work of securing the desired apparatus, under the direction of appellant.

Appellant testified that apparatus embodying the invention was installed in June, 1932, and that between that time and the following October many tests were made; that in October equipment installed and operated in accordance with appellant's original conception and disclosure was repeatedly tested with satisfactory results.

It is these October tests that appellant relies upon for actual reduction to practice of the invention.

It appears from the testimony that appellant kept a note-book in which he entered, from time to time as tests were made, data concerning his work upon the invention; weekly time cards were also filed by appellant with the Bureau of Standards upon which was noted the work done by appellant on each working day of the week. Photostats of the entries in the note-book and the original time cards filed by appellant were introduced in evidence.

There were also introduced in evidence photostats and printed copies of official reports made by appellant concerning the invention. One of these, Kear's Exhibit 17, is a publication entitled "Air Commerce Bulletin," issued on December 1, 1932, by the United States Department of Commerce. This exhibit contains a copy of a report made by appellant, Exhibit 14B, which discloses the involved invention and sets forth in detail its successful testing at College Park, Maryland.

We would here observe that appellant in his testimony went into great detail with regard to the testing of the invention at College Park.

Appellee sharply challenges the contention that said tests, as testified to by appellant, satisfactorily demonstrated the utility of the invention. For the purposes of this case we shall assume that appellant's evidence with respect to such tests, if sufficiently corroborated, establishes actual reduction to practice of the invention by him as early as October, 1932. Without such corroboration appellant cannot prevail, however credible his testimony may be.

■ Upon this point of corroboration appellant relies upon the testimony of Diamond, Horsman, and one Wm. E. Jackson. Mr. Jackson, who at the time of the taking of his testimony was chief of the Radio Development Section of the Bureau of Air Commerce, testified that in 1932 and 1933 he was employed in the Airways Division of the Department of Commerce, and that between June 1 and July 1, 1932, appellant disclosed to him the involved invention; that he witnessed the operation of certain apparatus set up by appellant at College Park during the period from June, 1932, to January, 1933. He, however, did not testify that he personally made such detailed observations of operations of the apparatus as would qualify him to corroborate appellant's testimony that the tests demonstrated the utility of the invention.

■ Appellant, however, particularly relies upon Jackson's testimony that he, Jackson, had personal knowledge of eight installations of appellant's invention, incorporated in airway beacons in eight cities between January 1, 1933, and January 1, 1935, and his (Jackson's) successful operation of the same. Jackson's testimony with reference to such operation is as follows: "I have personally inspected all of them, and as a matter of fact, tuned each of the equipments up, that is so that phase stabilization was in effect when using the Kear method of phase stabilization."

The witness, however, did not testify as to the dates of such installations or inspections, other than that they were between January 1, 1933, and January 1, 1935.

Of course this testimony could have no weight with respect to reduction to practice of the invention upon which an award of priority could be based unless the inspections took place before April 29, 1933 (appellee's filing date), or between immediately prior to that date and November 1, 1933 (appellant's filing date), said last named period being accompanied by diligence by appellant in reducing the invention to practice.

Such dates not being established, it cannot be held that the testimony of Jackson corroborates appellant's testimony as to reduction to practice, or constitutes in itself evidence of reduction to practice of the invention within the dates above mentioned.

In the case of Schneider v. Driggs, 36 App.D.C. 116, relied upon by appellant, the firing one hundred times of the gun embodying the invention of Driggs took place prior to the date of conception and reduction to practice awarded to Schneider. Therefore this case has no application to the case at bar.

■ The witness Horsman, as hereinbefore stated, was a mechanic, and while he had a general understanding of the problem which appellant was trying to solve, he did not pretend to be acquainted with the solution reached by appellant; and as to whether or not the tests conducted by appellant (in which the witness participated) were satisfactory, this witness relied wholly upon appellant's reactions to such tests and formed no judgment of his own with respect thereto.

■ The only witness whose testimony tends to corroborate appellant's testimony as to reduction to practice of the invention is Diamond; but the difficulty with that testimony is that it is not clear whether his corroborating testimony is based wholly upon his personal knowledge or in part upon conversations with appellant and upon reports, entries in appellant's note-book, and the time cards of appellant.

Upon this point the Board of Appeals in its decision stated: "Taking up now the question of corroboration as to the October 1932 tests, we do not find in the testimony of the witness Horsman, anything that convinces us that the tests were satisfactory. The record appears to indicate that the party Kear was an exceptionally able scientist and that his superior, the witness Diamond, had the greatest confidence in him. It is believed that the question of corroboration must primarily depend upon the testimony of this witness. It is not unlikely, we think, in view of the information which apparently was imparted to him by the party Kear, that he was convinced the system was fully operative. When his evidence is critically considered, however, it is found that he has given very little firsthand information as to details. As to this

important question, i. e., the satisfactory nature of the October 1932 test, it appears that most of the evidence offered by the witness Diamond is in the nature of hearsay testimony, depending either upon statements made to him by the party Kear or upon reports prepared by that party. It is our judgment that the corroborative evidence cannot be relied upon to justify a holding that the tests were satisfactory."

Upon this question of corroboration the Examiner of Interferences in his decision stated:

"The party Roder vigorously attacks the testimony relative to these tests contending that they are not sufficiently corroborated and therefore not proven and that the results even if proven do not indicate that the system was shown to be satisfactory.

"It is true that Horsman signed but one data sheet in the Kear notebook, exhibit 1, namely, page 0103 dated October 3, 1932, and that Horsman did not testify that he was present at each and every test. Horsman did state, however, that he spent his full time while at the Bureau of Standards working for Kear (Q. 14, page 146).

"Diamond also testifies that he was very interested in Kear's work and that he witnessed tests at College Park around the middle of October. Diamond also avers that he obtained his knowledge for the monthly reports on the project not only from conferences, time sheets, and reports but also through personal contact with the work (X Q. 118, page 142).

"This testimony together with the entries in Kear's notebook, exhibit 1, is believed to constitute sufficient corroboration of the tests.

    *    *    *    *    *    *

"Likewise, Diamond's report for the month of October 1932, which as before stated he made from knowledge obtained from personal contact as well as reports and which was made after Diamond's visit around the middle of October 1932, states:

" 'Equipment was constructed and installed for practical tests of the quarter-wave length and half-wave length synchronizing arrangements as applied to the TL-antenna set-ups at College Park. Both gave satisfactory results. With the quarter-wave lines, a change in antenna reactance (in percent of antenna resistance) of $+33\%$ resulted in a phase displacement between the two antenna currents of $+2$ degrees, which if within the desired limits

of satisfactory operation. With the half-wave length lines, a change of $+25\%$ was possible without exceeding the prescribed phase displacement of $+2$ degrees. Without synchronization, i. e., with the transmission lines as previously used, the permissible change in antenna reactance (in per cent of antenna resistance) in order to stay within the $+2$ degree limit was only $+1.5\%$.'

"From this evidence it appears therefore that Kear's system was proven satisfactory to all concerned at least as early as October 1932, and Kear is accorded a reduction to practice as of this date."

The witness Diamond testified in part as follows:

"75. Q. I hand you Kear Exhibit 8 and ask you what this exhibit represents to you? A. This exhibit shows a radio frequency source feeding two 90 degree transmission lines in parallel, each transmission line being made up of a 43 degree length of parallel conductor lines and a 47 degree building out section, and each transmission line is terminated at its far end with an antenna load.

"76. Q. Did you ever see such a construction at College Park, and if so, when? A. This constituted the proof of the pudding, and I did see such a set-up at College Park around the middle of October or possibly slightly before the middle of October.

"Mr. Morse. What is the number of that exhibit?

"The Witness. That is Kear Exhibit 8.

"By Mr. Stoutenburgh: 77. Q. What was the electrical length of the transmission lines—the effective length? A. 90 degrees.

"78. Q. How would you describe the operation of this device with respect to the stability of the space pattern? A. The way of testing it utilizes the scheme that we employed in connection with the development or with the tuning of the TL antennas; since these were two antennas of a pair, a third antenna, constituting one of the elements of the second pair, crossing at right angles to the first, would be equi-distant from the two elements of the first pair, so that if the phases in the two elements of the first pair were 180 degrees out of phase, the induced current in that third one would be zero.

"Now, then, the way this experiment was run, was to adjust the two antennas of the

pair under test, having these 90 degree transmission lines run into them from the common source, adjust them so that the currents in them were in exact opposition as evidenced by a meter connected into that third antenna equi-distant from each of the two antennas of the pair.

"Then, the next step was to de-tune one of these two antennas, and if phase synchronization held then the other antenna should—or the strength and phase of the current through it should vary by the same amount, and therefore they should remain in 180 degree phase difference, and the current in that third antenna should remain at zero, and the test was to see how much the power factor in one of these antennas could be varied, before that milliameter would read some current."

Appellant relies in part upon this testimony for corroboration of his testimony respecting reduction to practice; but it will be observed that nothing was said by the witness concerning the result of the test. True, he said that the test he observed was the "proof of the pudding," but it does not follow from this statement that the test was successful. The test could be the "proof of the pudding" either by a demonstration that the operation of the particular installation was successful, or by a demonstration that it was unsuccessful.

Upon cross-examination the witness Diamond testified in part:

"133. X Q. You stated that around the middle of October you were at College Park, and that you saw some tests there in which as you de-tuned one antenna the other antenna was also de-tuned? A. Yes.

"134. X Q. That means that they had series connecting lines at that time; is that right? A. No.

"135. X Q. Would that occur if the two lines were in parallel? A. Yes.

"135. X Q. You mean that if you have the source connected directly in parallel, with two transmission lines leading to two antenna and then you de-tune one of those, that the current in the other antenna will follow the phase of the current in the one? A. Yes.

"136. X Q. Will you explain that? A. That forms the subject matter of this invention. In other words, the object was to devise a circuit arrangement for synchronizing the phase of the currents in the two elements of a pair or more radiators, and Dr. Kear devised two methods for doing it, one which utilized a parallel connection of two 90 degree lines, and the other a series connection of 180 degree lines, both of which achieved the desired result."

It will be observed that in the last answer of the witness reference is made to two transmission lines—one 90 electrical degrees in length and the other 180 electrical degrees in length. The only tests testified to by the witness on his direct examination was of a line 90 electrical degrees in length. We gather from this fact that when the witness stated on cross-examination that both lines achieved the desired result he was not referring to any test that came under his personal observation, but was stating his general conclusion as to the successful operation of appellant's invention, not based upon personal observation alone.

We find nothing else in the testimony of this witness tending to corroborate, from personal knowledge of the witness, the successful testing of appellant's invention.

It appears that Mr. Diamond made monthly reports of the progress of the work under his supervision, parts of which reports were introduced in evidence as Kear's Exhibit 10. The report for the month of October, 1932, contains the following:

"*Transmission-Line Antenna System.*— The work on the third stage of the research on the TL-antenna system was continued. The quarter-wave length phase synchronizing arrangement was reexamined in the laboratory and found to give much improved results after adjustment of the artificial line sections to make the transmission lines more nearly 90 degrees long. Equipment was constructed and installed for practical tests of the quarter-wave length and half-wave length synchronizing arrangements as applied to the TL-antenna set-up at College Park. Both gave satisfactory results. With the quarter-wave lines, a change in antenna reactance (in percent of antenna resistance) of $+33\%$ resulted in a phase displacement between the two antenna currents of $+2$ degrees, which is within the desired limits of satisfactory operation. With the half-wave length lines, a change of $+25\%$ was possible without exceeding the prescribed phase displacement of $+2$ degrees. Without synchronization, i. e., with the transmission lines as previously used, the permissible change in antenna reactance (in percent of antenna

resistance) in order to stay within the $\pm 2$ degrees limits was only $\pm 1.5\%$."

Upon direct examination the witness stated:

"Referring to Kear Exhibit 10, will you state whether or not the pages of the reports to which you have referred accurately set forth facts within your personal knowledge as of the dates of those reports?

"The Witness. These pages accurately set forth knowledge as of the date, and my personal knowledge as of the dates of those reports."

In answer to another question the witness clearly indicated that he did not use the word "knowledge" in its restricted legal sense, for in testifying with respect to the December report he stated: "* * * There is an item dealing with the use of artificial lines, namely building-out sections, in the production of cardioid pattern. The cardioid pattern was to be of use in another project, and some test flights were made on the cardioid pattern, and also on the figure of eight patterns, produced as the device would normally be employed, which I had knowledge of, *by conference with the men making the tests.*" (Italics ours.)

Also, upon cross-examination the witness testified as follows:

"116. X Q. In connection with the report for August of 1932, page 3, I have reference to the number at the bottom of page, the top paragraph, you stated that that was prepared from conferences, time cards, and so forth, which were submitted to you as head of your division. A. Yes.

"117. X Q. *Isn't that the general way in which all of these reports were prepared?* A. Yes; from my own knowledge of the progress of the work, from conferences with the men involved, from reference to their weekly report cards, and other records.

"118. X Q. And when you stated that all of the facts recorded in this exhibit were of your own knowledge, you mean that you acquired that knowledge through conferences and through time sheets and reports made to you, as well as through some personal contact with the work? A. Yes." (Italics ours.)

After most careful consideration of the testimony of the witness Diamond, we are compelled to conclude, as did the Board of Appeals, that it cannot be relied upon to justify a holding that the tests were satisfactory.

It is interesting to observe, in this connection, that the Examiner of Interferences apparently was not satisfied that Diamond's testimony alone was sufficiently corroborative of appellant's claimed reduction to practice, for in his decision he stated that Diamond's testimony, together with the entries in Kear's note-book, Exhibit 1, is sufficient corroboration of the tests.

We have no doubt that the witness Diamond was fully convinced that appellant's invention was fully operative. Here there is no question of lack of credibility of appellant or of any of his witnesses. The only question is whether, fairly construing the testimony of Diamond and Horsman, and the other relevant evidence in the case, the testimony of appellant as to reduction to practice prior to appellee's filing date has been sufficiently corroborated.

That such corroboration of reduction to practice by an inventor is necessary in interference proceedings is well settled. In the case of George v. Karsel, 111 F.2d 148, 152, 27 C.C.P.A., Patents, 1063, we said: "This is one of those cases where the testimony of the inventor himself is persuasive; but the rule requiring corroboration of the testimony of an inventor in cases like that at bar is firmly established in patent law and upon the whole is a very salutary rule."

A like observation is applicable to the case at bar. All of the witnesses appear to be men of high character, and the testimony of appellant, together with his note-book and time cards, is very persuasive; but unless there be independent corroboration of his testimony respecting actual reduction to practice, no award of priority based upon such actual reduction may be made.

Appellant's counsel contend, however, that appellant's note-book entries and official reports, together with Diamond's official report, Kear Exhibit 10, from which we have hereinbefore quoted, corroborate appellant's testimony pertaining to successful reduction to practice in October, 1932.

All of these documents, however, except the Diamond report, are merely self-serving declarations of appellant, they having been made by him.

With respect to Diamond's report, it is clear to us, as hereinbefore indicated, that the statements therein contained were not wholly within the personal knowledge

of Diamond, but were based in part upon statements and reports made by appellant, and therefore such report may not be relied upon for corroboration of appellant's testimony so far as actual reduction to practice is concerned.

With respect to reports made by appellant, we call attention to our decision in the case of Collins v. Olsen, 102 F.2d 828, 831, 26 C.C.P.A., Patents, 1017, where a very similar question was presented. In that case Olsen had made reports to his superior officer of successful tests of the invention conceived by him, and such reports were relied upon as corroborative of Olsen's testimony. In our opinion we stated: "We must conclude that statements in reports by Olsen, no matter how clear, as to what he used, what he did and what the results were, cannot be accepted as proof of reduction to practice, unless fully corroborated, even though such reports were made to an official who had such confidence in their accuracy that he was willing to act upon them without complete and independent investigation. While they constitute good evidence of conception, they are self-serving on the question of reduction to practice [citing cases.]"

In the case of Petrie v. De Schweinitz, 19 App.D.C. 386, cited in the above case, the Court of Appeals for the District of Columbia stated: " * * * The evidence of self-serving declarations concerning an invention, whilst admissible as disclosures tending to establish the fact of conception, are clearly incompetent to prove the independent fact of reduction of that conception to practice."

█ For the reasons hereinbefore stated, we must agree with the Board of Appeals that the evidence relied upon by appellant for corroboration of his testimony respecting actual reduction to practice in 1932 does not justify a holding that the tests made by appellant were satisfactory.

Appellant next makes the contention that the publication of his invention in the December 1, 1932, issue of the Air Commerce Bulletin was a constructive reduction to practice of the invention. In support of this contention he cites the case of Marconi v. Shoemaker, 1907 C.D. 392, wherein the then Commissioner of Patents, after citing certain publications disclosing the invention there involved, stated: "Under section 4886 of the Revised Statutes [35 U.S.C.A. § 31] the disclosure of an invention in any prior printed publication in this or in any foreign country is an absolute bar to the

granting of a patent to one who subsequently makes that invention. It is well settled, however, that in order to constitute such a bar the earlier printed and published description must exhibit the invention in such full and intelligible manner as to enable persons skilled in the art to which the invention relates to understand the operation of the invention and to carry it into practical use. (citing cases.) When, therefore, a publication is sufficient to constitute a bar against all later inventors, it should manifestly be accepted as establishing the rights of the one who made that disclosure and who with reasonable promptness filed his application for patent in the United States."

The holding embraced in the last sentence of the quotation has never, so far as we have been able to ascertain, been followed by Patent Office tribunals or by any court.

█ We have had this question of constructive reduction to practice before us many times, and have consistently held that in interference cases a disclosure of an invention in an issued patent, the invention not being claimed therein, does not constitute a constructive reduction to practice of the invention if there be a hiatus between the time of issue of such patent and the filing of a new application disclosing and claiming the invention disclosed in the patent.

The first of these cases decided by us is that of Conover v. Downs, 35 F.2d 59, 17 C.C.P.A., Patents 587, where the question was fully discussed, and it was held that a patent issued upon an application disclosing but not claiming the invention involved in the interference did not constitute a constructive reduction to practice of the invention, where there was a hiatus in the Patent Office between the issued patent and the application in interference.

We have repeatedly affirmed this holding, the latest case coming before us being that of McBride v. Teeple, Jr., 109 F.2d 789, 795, 27 C.C.P.A., Patents, 961. In that case one of the questions was whether a patent issued to appellant McBride prior to the filing date of his application in interference, which patent disclosed but did not claim the involved invention, could be availed of by the appellant not only for conception but for constructive reduction to practice of the invention. In our opinion in that case we reviewed our decision in Conover v. Downs, supra, stating:

"* * * In the latter case the very question before us was directly involved, and after reviewing a number of precedents upon the question we held that where an application involved in an interference was not filed until after the grant of a patent disclosing but not claiming the invention, the filing of the application which matured into a patent was not a constructive reduction to practice of the invention in issue. The situation before us is exactly that which existed in the Conover case, and it is clear that we could not agree with appellant's contention without overruling our holding in said case. We adhere to the views there expressed and would observe that we have expressly affirmed this holding in the following cases: Fessenden v. Wilson et al., 48 F.2d 422, 18 C.C.P.A., Patents, 1171; Writer v. Kiwad, 63 F.2d 259, 20 C.C.P.A., Patents, 869; and Euth v. Oliver, 70 F.2d 110, 21 C.C.P.A., Patents, 1027.

"This question has been so thoroughly considered by us in the cited cases that we do not consider it open to further discussion."

It should require no argument to demonstrate that if an issued patent, standing alone, disclosing but not claiming an invention, without any copending applications disclosing and claiming it, is not a constructive reduction to practice of the invention, the mere publication of an invention by an inventor in a bulletin or magazine is not in law a constructive reduction to practice of the invention thus disclosed.

The doctrine of constructive reduction to practice of inventions is fully reviewed in the case of Automatic Weighing Machine Co. v. Pneumatic Scale Corp., 1 Cir., 166 F. 288, and it is so well established that we deem no further discussion is here required. We hold that the publication in the Air Commerce Bulletin, relied upon by appellant, while evidence of conception of the invention by him, is not a constructive reduction to practice of the invention.

Whether this publication is a statutory bar to appellee receiving a patent is a matter for later ex parte consideration by the Patent Office tribunals, but may not be raised in this proceeding. Hendrickson & Nelson v. Ronning & Ronning, 76 F.2d 137, 22 C.C.P.A., Patents, 1040.

It may seem anomalous to hold that a publication of an invention by an inventor may be a bar to the granting of a patent to another, while the same publication in an interference proceeding between the same parties may not, standing alone, be made the basis of an award of priority of invention to him who first published the same.

This seeming anomaly is due, however, to statutory provisions.

Congress in its wisdom saw fit to provide, in section 4886 R.S., 35 U.S.C.A. § 31, that the mere disclosure of an invention in a printed publication should, under certain circumstances, constitute a bar to the granting of a patent to another on a later application. No such provision, however, is found in section 4904, 35 U.S.C.A. § 52, relating to interferences. In this section it is made the duty of the tribunals of the Patent Office to determine priority of invention between the parties, and in these proceedings reduction to practice of the invention, either actual or constructive, is essential, not because of any specific statutory provision, but because of the application of general principles of law, and rules of practice which have obtained for many years.

The practical necessity for the application of this statutory bar in ex parte proceedings is apparent. To require evidence of actual reduction to practice of an invention disclosed in a printed publication would be wholly impracticable, and if required many invalid patents would be issued, while in interference proceedings the parties have full opportunity to establish the facts with respect to the completion of an invention by reduction to practice. If a junior party fails to do this in accordance with well settled principles of law, he has failed to sustain the burden upon him and priority must be awarded to the senior party, even though such senior party may not be entitled to a patent if, under the law and rules of the Patent Office, he is subject to the application of a statutory bar.

There remains the question of diligence of appellant in reducing the invention to practice. We agree with the Patent Office tribunals that appellant has established that he was the first to conceive the involved invention, and we agree with the Board of Appeals that, upon the record before us, appellant was the last to reduce the invention to practice, his filing date being subsequent to the filing date of appellee. Therefore, in order for appellant to succeed, he must have established diligence on his part in reducing the invention to

practice from immediately prior to appellee's filing date, April 29, 1933, to appellant's filing date, November 1, 1933.

We find no evidence in the record of diligence by appellant in reducing the invention to practice at and immediately before appellee's entry into the field, nor for several months thereafter.

For the reasons stated the decision appealed from is affirmed.

Affirmed.