**THOMPSON et al. v. AMERICAN TOBACCO CO.**

No. 5821.

United States Court of Appeals Fourth Circuit.

Argued April 5, 1949.

Decided May 10, 1949.

Walter G. M. Fields, Washington, D. C., and Charles K. Davies, Jr., Bethesda, Md. (Frank E. Scrivener, Washington, D. C., on the brief), for appellants.

Daniel V. Mahoney, New York City (F. L. Fuller, Jr., Durham, N. C., and Pennie, Edmonds, Morton & Barrows, New York City, on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This appeal is taken from a judgment whereby the District Court dismissed the suit for patent infringement brought against the American Tobacco Company by the owners of United States Patent No. 2,388,772 issued to Ross Thompson. The court reached the conclusion that Thompson was not the inventor of the machine described in the patent, that the patent was invalid in view of the prior art and in view of the public use of the patented machine for more than one year prior to November 9, 1942 when the application for the patent was filed, and that even if the patent is considered valid, the American Tobacco Company is entitled to free use of the invention because it was discovered in the company's factory while Thompson was in its employ and the first machine under the patent was built in the factory at its expense.

The invention concerns a tobacco feeder for use in connection with a machine for the commercial manufacture of cigarettes. A tobacco feeder consists essentially of a rear hopper in which the tobacco is placed by hand and a front hopper into which the tobacco is delivered at a uniform rate. Between the hoppers two drums are mounted: a lower (feed) drum which revolves in a direction to feed the tobacco into the front hopper, and an upper (refusing) drum which is placed slightly forward and above the feed drum, and revolves in a direction to return any excess tobacco to the rear hopper. The drums are so placed that at one point they are spaced from each other only a slight distance. The surface of the drums is covered with cloth provided with projecting carding pins and the covering of the feed drum is coarser than that of the refuser drum. The tobacco is carried to the drums by a slowly moving belt, becomes enmeshed in the filleting of the feed drum and is carried forward to engagement with the filleting of the refuser drum.

This arrangement was in use prior to the patent in suit; and it had been found that the uniformity of the feed, which is necessary to the production of the best cigarettes, would be promoted if the shredded tobacco is compacted or tamped into the filleting of the feed drum; and a number of patents for tamping mechanism were granted, including the patents to Podmore Nos. 1,907,575 and 1,935,665 which were applied for on August 22, 1929 and November 21, 1928 respectively, and issued on May 9, 1933 and November 21, 1933 respectively. The function of such an apparatus is described in the following language in the Gwinn patent No. 1,959,916 of May 22, 1934 for tampers for cigarette machine feeds: "In the present invention this condition is overcome by alternately lifting a plurality of spaced tampers from the tobacco, simultaneously with the descending of a corresponding number of spaced tampers on the tobacco. Thus, there is always some pressure on the tobacco, and the portions of the tobacco, which are now compressed, tend, due to the stringy nature of tobacco, to keep the adjacent portions of the tobacco in a compressed state. In this manner a uniform density of the tobacco between the pins of the feed drum is always induced, thus producing a cigarette rod of uniform density."

It had also been found that in the operation of the drums there is a tendency to feed too much tobacco to the feed drum and consequently a rake mechanism was developed to sweep over the space in the rear of the tampers and remove the excess tobacco to the rear of the drum. Such a raking mechanism is shown in combination with tampers in Podmore Patent No. 1,935,665 and in other prior art patents.

Tampers and rakes in combination were also shown in feeding apparatus on machines known as 1-59, 1-89 and 1-96 which had been manufactured by the American Machine & Foundry Company and were in use at the Durham plant of the American Tobacco Company where the machine described in the patent in suit was developed.

This development was undertaken by the company because it also operated certain tobacco feeders in the Durham plant which had been manufactured by the Bonsack Machine Company and were not equipped with tampers or rakes.

The machine of the patent differs from those in prior use in some details of the means for raising the tamper weights and permitting them to fall of their own weight upon the tobacco as it is carried forward by the feeder drum. The specific means consists of an oscillating shaft over which chains are passed by means of which the weights are raised when the shaft revolves in one direction and are allowed to fall when it revolves in the opposite direction. The chains are passed over the shaft from opposite sides so that the oscillation of the shaft lifts each alternate tamper as the other tampers are allowed to fall. The direction in which the tampers move is controlled by guide rods which are so positioned that the tampers move along their longitudinal axes in a direction substantially radial of the feed drum and at an acute angle to the vertical. The tampers in their lowest position do not touch the feeder drum but compact the tobacco evenly across the length of the drum in a line not far removed from the point where the refuser drum and the feeder drum are in closest proximity.

The patent also shows a rake mechanism consisting of a bar equipped with a plurality of tines and extending across the bin which contains the tobacco. It was copied without material change from the rake mechanism used on machines manufactured by the American Machine & Foundry Company and operated in the company's Durham plant.

Claims 1 to 3 of the patent cover the tampers and claim 4 covers the combination of tampers and rake. Claims 2 and 4 are as follows:

"2. In a cigarette making machine having a rotary feed drum, a set of elongated weight bars supported for longitudinal reciprocating movement in a path radially of the drum and acutely inclined from the vertical, and rocker mechanism including flexible means connected with alternate weight bars on opposite sides of the axis of the weight bars and operable to reciprocate alternate weight bars of the set in reverse directions.

"4. In a cigarette making machine having a rotary feed drum, a set of elongated weight bars mounted for longitudinal reciprocating movement in a path acutely inclined from the vertical and adjacent the drum, a reciprocating rake bar, and a multiplicity of tines fixed to the rake bar and directed at a downward inclination converging toward the weight bars for movement toward and away from the drum."

Thompson concedes [1] that his invention does not reside in the up and down movement of the tampers or in the mechanism by which they are driven, or in the rake; but he asserts that the gist of the invention and the only element upon which he bases any claim of patentability is that tamper weights are mounted for longitudinal reciprocating movement in a path approximately radial of the drum and acutely inclined to the vertical. This construction differs from the prior art in that the arms of the tampers in the early machines were arcuate in shape and were curved around the upper drum from a point above it so that the heel of the tampers would reach the tobacco as it was fed to the space between the drums. The curved arms of the tampers were due to the location of the oscillating shaft by which the tampers were operated. This was located in the prior machines in front of the drums so that it was convenient to curve the shafts of the tampers around the upper drum in order that the heel of the tampers might reach the tobacco as it was fed to the space beneath the drums. This location of the oscillating shaft was decided upon when the executives of the company determined to

[1] Prior to this concession at the trial in the District Court, Thompson included a claim in his application for the patent for a rake mechanism similar to that included in the 1-96 machine of the American Machine and Foundry Company used in the defendant's factory; and in his deposition taken before the trial he testified that he had never seen the 1-96 machine or at least did not know it by that name.

install tampers on the Bonsack machines that could be easily removed. In order to obtain this result they decided to place the oscillating shaft behind the feeding drums and to connect it to the drive of the rake mechanism which had always been located behind the drums. By reason of this change it was no longer necessary to use tampers that moved in an arcuate path since they could approach the feeding drum in their up and down movement in a straight line; and this line approached the feeder drum in an angle acute to the vertical so that the tampers might compact the tobacco at the same place which is reached by the tampers which are arcuate in shape.

The circumstances under which the machine of the patent was designed and built must now be considered. The first step in the construction was taken on April 18, 1941, when the company notified its branch managers at Durham and other points that the feed of its Bonsack machines would be widened and then equipped with tampers designed by the company. In the execution of this plan the superintendent of the Lucky Strike factory at Durham decided to build a machine from which the tampers could be easily removed as above described. In order to execute the work a Bonsack machine was removed from the factory and placed in the machine shop and Thompson, who was an experienced machinist, was assigned to do the work under the direction of the head machinist. Another machinist by the name of Clark was also assigned to the work. The work began in the month of June and was finished in time to return the improved machine to the line of machines in the factory used for production by July 5, 1941.

Thompson testified that he endeavored to achieve the desired end by carrying out the instructions of his superiors but found them to be impracticable; that he then informed his superiors that he could build the machine in accordance with plans which he had made on his own initiative at his home before his assignment to the work, and that he was given permission to go ahead and the result was the machine of the patent. He said that he worked from sketches which he had made at home in the latter part of 1940.[2]

■■■ Testimony on the part of the company controverted Thompson's assertion that he told his superiors about his original plan of doing the work on the machine. Moreover, Thompson failed to produce the 1940 sketches or to convince the court that he used them while building the machine. His superiors were not shown the plans and Clark, his associate, said that the only sketches he saw were such as Thompson would put on a scratch pad for the instruction of his helpers. The only other person who claims to have seen sketches was a machinist, not employed on the specific work, who said that in the early summer of 1941 he saw Thompson working in the machine shop and using sketches. A draftsman employed by Thompson testified that in February, 1942 Thompson gave him five or six sketches to be used in making drawings for the patent application and that he returned them to Thompson. Thompson said that these were the original sketches, but he failed to produce them at the trial or to account for their absence. It is evident that this effort on the part of the patentee to prove that he reduced the invention to practice in 1940 must be regarded as unsuccessful in the light of the decisions of the courts in patent cases. The established rules in similar and analogous situations demand a greater measure of proof. Thus it is held in interference proceedings that the claim of an inventor to

---

2 The appellant places great emphasis on the contention that two attempts were made in 1941 in the company's machine shop to equip the Bonsack feeders with tampers; and that the first attempt failed and that it was only when he was given permission to make a second machine that success was achieved. The testimony as to whether more than one machine was made during the progress of the work is conflicting, but the weight of it is that only one machine was made and returned to the factory. The point, however, is immaterial for the evidence is uncontradicted that the change in the position of the oscillating shaft was suggested by the superintendent of the factory. Whether or not the substitution of straight for arcuate tampers amounted to invention is discussed in the body of the opinion.

priority is not sustained unless there is corroborating testimony. Kear v. Roder, 28 C.C.P.A., Patents, 774, 115 F.2d 810, 817; and in suits for patent infringement that one who seeks to carry the date of his invention back of the date of anticipating patents must assume the burden of proof and establish his claim by clear and unequivocal evidence. American Lecithin Co. v. Warfield Co., 7 Cir., 128 F.2d 522.

These circumstances demonstrate the correctness of the conclusions of the District Judge that Thompson did not invent any essential feature of the machine disclosed by the patent, and that the patent in suit is invalid for anticipation and lack of invention in view of the prior art. The use of tampers that move in a straight path radial to the feeder drum and at an angle acute to the vertical was a natural mechanical sequence to the location of the operating shaft, to which the tampers are attached behind the drums. Once this new location of the shaft was determined the necessity for curved tampers disappeared and the substitution of straight line tampers was obvious to any skilled mechanic. It is plain that the new arrangement differs from the old only in immaterial mechanical detail. The evidence shows that it is the end of the tamper that does the work and that it moves only 2¾ inches to and from the drum in actual operation, so that so far as the effect of the contact of the end of the tamper with the tobacco is concerned, it makes no difference whether the upper part of the tamper moves in a straight or curved line. Indeed the evidence on behalf of the patentee does not indicate that the change improved the uniform compaction of the tobacco, whereas the testimony of the defendant showed that the change produced no beneficial result in this respect. We think that there was no patentable distinction between the tampers of the patent and those of the prior art because mere structural changes which involve nothing more than the exercise of the skill of the art do not rise to the dignity of invention. Sanford Investment Co. v. Enterprise Wheel & Car Corp., 4 Cir., 131 F.2d 837; Pearson Sanding Mach. Co. v. Williams Furniture Co., 4 Cir., 132 F.2d 55.

Invalidity is also demonstrated by the court's finding that the machine of the patent was in public use for more than one year before November 9, 1942, the filing date of the patent. It is conceded that the machine was built and first used in the factory on or about July 5, 1941. The patentee, however, contends that this use of the machine was experimental only and that it remained in the experimental stage until the early part of 1942; and it is pointed out that under the decisions, this kind of use of a patented article, which is intended to be kept from the knowledge of the public in general, does not invalidate a patent filed for more than a year after the use has begun. Matthews v. Koolvent Metal Awning Co., D.C.Ga., 60 F.Supp. 3; Cline Electric Mfg. Co. v. Kohler, 7 Cir., 27 F.2d 638.

The evidence, however, indicates that the experimental use of the machine terminated in August, 1941. The machine was run for several weeks during July, in which period certain adjustments were made. It was then removed from the factory and dismantled so that drawings might be made for the purpose of manufacturing a sufficient number of machines to install in the company's Bonsack feeders. The machine was reassembled and returned to the factory in line with other machines for commercial production as early as August, 1941, as is shown by the records of the company. These indicate that the feeder in question had a regular place in the line of the machines for the commercial production of cigarettes until some time in June, 1941, when it was removed for the installation of the tampers, and that it was tested again with other commercial machines on August 13 and September 17, 1941. The patentee concedes that it was in commercial operation when he left the company in February, 1942.

It thus appears that at least from August 13 the machine was in commercial use on the floor of the company's factory together with machines regularly used for the manufacture of cigarettes that were subsequently sold. Such use of a patented machine in a place in a factory where any one who chooses may see it in operation, and where the employees are placed under

no obligation of secrecy, and no attempt is made to keep the machine from the knowledge of the general public, constitutes a public use contemplated by the statute. See Brush v. Condit, 132 U.S. 39, 10 S.Ct. 1, 33 L.Ed. 251; Jenner v. Bowen, 7 Cir., 139 F. 556; W-R Co. v. Sova, 6 Cir., 106 F.2d 478, 482; Midland Flour Milling Co. v. Bobbitt, 8 Cir., 70 F.2d 416; Peerless Roll Leaf Co. v. H. Griffin & Sons Co., 2 Cir., 29 F.2d 646.

 Finally it appears that irrespective of the question of validity, the company has the right to use the patent because the machine was designed and made in its factory with its materials and appliances by Thompson during his hours of employment, as has been shown above. The rule is thus stated in United States v. Dubilier Condenser Corp., 289 U.S. 178, 188, 53 S.Ct. 554, 557, 77 L.Ed. 1114, 85 A.L.R. 1488: "Though the mental concept is embodied or realized in a mechanism or a physical or chemical aggregate, the embodiment is not the invention and is not the subject of a patent. This distinction between the idea and its application in practice is the basis of the rule that employment merely to design or to construct or to devise methods of manufacture is not the same as employment to invent. Recognition of the nature of the act of invention also defines the limits of the so-called shop right, which, shortly stated, is that, where a servant, during his hours of employment, working with his master's materials and appliances, conceives and perfects an invention for which he obtains a patent, he must accord his master a nonexclusive right to practice the invention. McClurg v. Kingsland, 1 How. 202, 11 L.Ed. 102; Solomons v. United States, 137 U.S. 342, 11 S.Ct. 88, 34 L.Ed. 667; Lane & Bodley Co. v. Locke, 150 U.S. 193, 14 S.Ct. 78, 37 L.Ed. 1049. This is an application of equitable principles. Since the servant uses his master's time, facilities, and materials to attain a concrete result, the latter is in equity entitled to use that which embodies his own property and to duplicate it as often as he may find occasion to employ similar appliances in his business. But the employer in such a case has no equity to demand a conveyance of the invention, which is the original con-

ception of the employee alone, in which the employer had no part. This remains the property of him who conceived it, together with the right conferred by the patent, to exclude all others than the employer from the accruing benefits. These principles are settled as respects private employment."

See also, Kober v. United States, 4 Cir., 170 F.2d 590; Houghton v. United States, 4 Cir., 23 F.2d 386. The rights of the employer are more extensive when the invention is made by a person who is employed to make it and succeeds during the term of his service in accomplishing the task, for in such case he is bound to assign to his employer any patent obtained. The company in the pending case, however, makes no effort to secure an assignment of the patent but contends that no patentable invention is involved. It is, however, entitled to the right to use the machine and to reproduce it indefinitely under the rule above set out.

Affirmed.