**SPERRY RAND CORPORATION, John Presper Eckert, Jr., and John W. Mauchly, Plaintiffs,**

v.

**BELL TELEPHONE LABORATORIES, INCORPORATED, Defendant.**

United States District Court
S. D. New York.

Sept. 6, 1962.

See also 171 F.Supp. 343; 173 F.Supp. 714.

Byerly, Townsend, Watson & Churchill, New York City, for plaintiffs, C. Blake Townsend, Carroll G. Harper, Robert E. Kosinski, New York City, of counsel.

Henry R. Ashton, New York City, for defendant, Harry R. Pugh, Jr., New York City, William F. Simpson, New York City, of counsel.

DAWSON, District Judge.

This is an action brought by Sperry Rand Corporation and its assignors, Eckert and Mauchly, the dissatisfied parties to a decision of the Board of Patent Interferences of the United States Patent Office, for an order under 35 U.S.C. § 146 directing the Commissioner of Patents to issue them a patent.[1]

---

1. The relevant portions of 35 U.S.C. § 146 read as follows:

"Any party to an interference dissatisfied with the decision of the board of patent interferences on the question of priority, may have remedy by civil action, if commenced within such time after such decision, not less than sixty days, as the Commissioner appoints or as provided in Section 141 of this title, unless he has

The interference proceeding involved an application for a patent for an electronic computer by the plaintiffs Eckert and Mauchly, Serial No. 757,158, filed on June 26, 1947, and Williams' application, Serial No. 22784, filed April 28, 1948, a division of an earlier application of Williams, Serial No. 734,661, filed March 14, 1947. The decision of the Board of Patent Interferences in Patent Interference No. 85,809, which was handed down on September 29, 1955, held that the evidence submitted by Eckert and Mauchly was not sufficient to prove a reduction to practice by them prior to the filing of the Williams application on March 14, 1947. The Board of Patent Interferences therefore granted priority to Williams. Subsequently, on December 24, 1957, Patent No. 2,817,477, which includes the counts involved here, was issued to Williams. The Williams applications have been assigned to the defendant Bell Telephone Laboratories, Incorporated.

By stipulation of the parties, as confirmed by an order of this Court dated March 1, 1961, it was agreed that any testimony desired to be presented in this action could be submitted in the form of affidavits, depositions or oral testimony, or in any combination of these forms, that such affidavits should be mutually exchanged prior to trial and that each party should have the right to cross-examine the affiants by deposition under oath. Pursuant to the foregoing stipulation the case on both sides was presented by means of several hundred exhibits and affidavits, without any oral testimony. In this manner what was originally predicted to be a trial of several months' duration was reduced to a single day.

At the conclusion of the trial the Court made a physical examination at a New York warehouse of the electronic calculator on which the plaintiffs' application is based. Subsequent to the trial both parties filed elaborate briefs of law and summaries and descriptions of the affidavits and exhibits submitted at the trial.

On the basis of the evidence submitted the Court finds the following facts:

The plaintiffs' patent application and their proofs are all predicated upon an electronic computer known as the "Electronic Numerical Integrator and Computer" (ENIAC). Work on the ENIAC was initially begun under Government contract during World War II in order to develop a computer which would be able to calculate the necessary firing tables for artillery and anti-aircraft pieces. The decision to develop an electronic computer was made by the Ordnance Department after calculations by professional mathematicians and non-electronic devices proved inadequate. About 1942 the plaintiffs Eckert and Mauchly, who were then teaching at the Moore School of Electrical Engineering of the University of Pennsylvania, developed a plan for an electronic calculator of the general purpose type. When this fact came to the attention of the Army Ordnance authorities they let out a contract to the Moore School for the development of an electronic calculator and actual work on the machine was commenced early in 1943. Physical construction of the final ENIAC machine was completed at the Moore School late in 1945. The significance of the events which transpired in the next eight or nine months in regard to what was done

appealed to the United States Court of Customs and Patent Appeals, and such appeal is pending or has been decided. In such suits the record in the Patent Office shall be admitted on motion of either party upon the terms and conditions as to costs, expenses, and the further cross-examination of the witnesses as the court imposes, without prejudice to the right of the parties to take further testimony. The testimony and exhibits of

the record in the Patent Office when admitted shall have the same effect as if orginally taken and produced in the suit.

\* \* \* \* \*

"Judgment of the court in favor of the right of an applicant to a patent shall authorize the Commissioner to issue such patent on the filing in the Patent Office of a certified copy of the judgment and on compliance with the requirements of law."

with the ENIAC are crucial to this case and will be discussed in some detail later in this opinion. Both parties agree, however, that on July 25, 1946, title to the ENIAC machine was transferred to the Ordnance Department and by August, 1946, the ENIAC was being put to practical use by the Government in calculating firing tables.

 Through the commendable efforts of both parties the issues in this action have been greatly simplified. At an earlier stage of the case the defendant maintained (1) that plaintiffs had not proved the reduction to practice of the invention in issue prior to March 14, 1947, the filing date of the Williams application No. 734,661, (2) that if the ENIAC machine was reduced to practice, the machine was in public use more than one year prior to the filing of the Eckert and Mauchly application on June 26, 1947, so as to bar them from securing a patent, and (3) that even if Eckert and Mauchly had reduced the ENIAC to practice prior to 1947, and even if they were not barred by prior public use, Williams would still be entitled to priority on the basis of his original patent application filed in 1942 and later abandoned in favor of the continuation-in-part 1947 application. The decision of the Board of Patent Interferences with which plaintiffs are dissatisfied rested on the first of the defendant's contentions, namely that plaintiffs had not proved the reduction to practice of the invention in issue prior to March 14, 1947, the filing date of the Williams application. At this trial the plaintiffs introduced a considerable amount of additional evidence which was not presented to the Board of Patent Interferences. The proofs introduced by the plaintiffs on this point have been so convincing that the defendant has abandoned its earlier contention that the plaintiffs did not reduce the ENIAC to practice prior to the date of the Williams application.[2] The defendant thus recognized that the basis for the decision of the Board of Patent Interferences was erroneous. Although the question of plaintiffs' reduction to practice is no longer disputed by the defendant, it is apparently the duty of the Court, under 35 U.S.C. § 146, to pass on the issue. Accordingly, the Court has made an independent examination of the evidence and concludes, in accordance with what both parties recognize, that the ENIAC must be regarded as having been reduced to practice at least by August 7, 1946 when it was first used in the solution of an actual problem the results of which were put to practical use. The decision of the Board of Patent Interferences awarding priority to Williams on the basis of plaintiffs' failure to prove a reduction to practice of their invention, must therefore be set aside. This disposes of the first of the defendant's original contentions.

In addition, after considering the available evidence and the difficulties of proof, the defendant does not now rely on the 1942 application filed by Williams.[3] This disposes of the third of the defendant's original contentions.

2. The trial brief for defendant states (p. 4):

"The evidence now brought forward by plaintiffs and particularly the affidavits recently furnished, together with the blue prints and other exhibits referred to in the affidavits, goes far beyond the evidence presented in the Patent Office. This new evidence shows that the ENIAC machine, corresponding to the counts involved in the present action, was built and operated prior to the end of 1945 * * *.

"Accordingly, defendant does not contest plaintiffs' proof of reduction to practice prior to that date. However, in view of the public interest involved, we believe the Court is required to pass on that issue unless it dismisses the complaint for prior public use, as we believe it should do."

3. Defendant's trial brief states (p. 6):

"If defendant were to attempt to rely on the 1942 application, the decision as to whether the 1942 application is operative would depend on whether or not an ordinary man skilled in the art in 1942, could have corrected the Williams disclosure and made an operative machine from it without himself exercising any invention.

There remains for consideration the sole issue on which the defendant now bases its case, namely, that the ENIAC was in public use for more than one year prior to the filing of the Eckert and Mauchly application on June 26, 1947 and therefore that the invention is ineligible for a patent under 35 U.S.C. § 102.[4]

■ There is a dispute as to whether the question of prior public use is a proper issue in this case at all. The plaintiffs contend that the question of public use relates to the patentability of the invention, rather than to the question of priority which is the subject of this proceeding on appeal from the Patent Office. However, since the relief sought in this case is to direct the Commissioner of Patents to issue a patent to the plaintiffs, such relief could not be given unless the Court were satisfied that the plaintiffs were in all respects entitled to a patent.[5] It appears that in a Section 146 proceeding where the issue of priority is resolved in favor of the plaintiff the court is required to consider whether the plaintiff is in all respects entitled to a patent. Hill v. Wooster, 132 U.S. 693, 10 S.Ct. 228, 33 L.Ed. 502 (1890); Sinko Tool & Mfg. Co. v. Automatic Devices Corp., 136 F.2d 186, 189 (2d Cir. 1943); Wiegand v. Dover Mfg. Co., 292 F. 255 (N.D.Ohio 1923).

■ In Sanford v. Kepner, 344 U.S. 13, 73 S.Ct. 75, 97 L.Ed. 12 (1952) it was held that in a Section 146 proceeding where the plaintiff had not established priority, the court was not required to pass on the patentability of the defendant's invention. In accordance with that decision this Court, at an earlier stage of this action, denied the motion of the plaintiffs to amend their complaint so as to raise the issue of the patentability of the *defendant's* invention. Sperry Rand Corp. v. Bell Telephone Laboratories, Inc., D.C., 171 F.Supp. 343 (1959), motion for re-argument denied, D.C., 173 F.Supp. 714 (1959), leave to appeal denied, 272 F.2d 29 (2d Cir. 1959). The situation is entirely different, however, where the *plaintiff* is able to establish priority, since it then becomes necessary for the Court to adjudicate the question of patentability of the *plaintiffs'* invention in order to be able to direct the Commissioner to issue a patent to the plaintiffs. Hill v. Wooster, supra.

The Court will therefore consider the question of public use.

The defendant relies on a number of events which took place prior to June 26, 1946, which allegedly constitute a public use of the invention for one year prior to the application for the patent. The plaintiffs, on the other hand, contend that all uses of the ENIAC machine prior to the date on which it was turned over to the Ordnance Department were experimental and not public uses. The principal incidents on which the defendant relies to show public use are the following:

"After considering the available evidence and the difficulties of proof, defendant has decided not to rely on the Williams 1942 application, but instead to concentrate its attention on the proof of public use of the ENIAC, which, in our view, calls for a dismissal of the complaint, thus disposing of the present suit without reaching any other questions."

4. Section 102 of 35 U.S.C. provides that: "A person shall be entitled to a patent unless—* * * (b) the invention was * * * in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States * * *."

5. The plaintiffs make the point that their prayer for relief in the form of directing the Commissioner to issue them a patent is conditioned "upon plaintiffs' further compliance with the requirements of law pertaining to such issue of patents * * *." However, this limiting phrase, which is a paraphrase of a portion of Section 146, appears to be directed to the formalities of securing a patent rather than to demonstrating before the Commissioner that the invention had not been in public use for more than one year prior to the date of filing. Under the circumstances, since the merits of the issue have been fully briefed and argued by the parties, it seems highly desirable as well as necessary for the Court to pass on the question of public use. See Sanford v. Kepner, 344 U.S. 13, 15, 73 S.Ct. 75, 97 L.Ed. 12 (1952).

(1) Commencing in the latter part of November, 1945, the ENIAC was used for computations on a complex problem for the Los Alamos Atomic Energy project.

(2) After December 17, 1945 the general principles of design and operation of the ENIAC were declassified and only design details and circuits remained classified as "confidential".

(3) On February 1, 1946 the ENIAC was used before members of the press to perform various computations, including a rerun of an operation of the Los Alamos problem.

(4) A public dedication ceremony was held for the ENIAC on February 15, 1946 and the machine was used before the invited guests to perform computations, including the computation of a ballistical projectory.

(5) The ENIAC was also used before faculty members and students at the University of Pennsylvania to perform various computations at an open house held February 16, 1946.

(6) Even prior to the dedication ceremonies the inventors who had developed the ENIAC transferred their attention to work on a different machine, signifying that all experimental work on the ENIAC was completed.

(7) The ENIAC was used by government personnel prior to June 26, 1946 for the purpose of learning how best to use the machine.

■ The Court has made an examination of the facts of all the incidents relied on by the defendant and arrived at the conclusion that the ENIAC was not in public use prior to June 26, 1947, within the meaning of 35 U.S.C. § 102.

Certain instances of what constitutes a public use are clear. For example, the continuous employment of a machine and process for general commercial production obviously constitutes a public use. Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 20, 613, 616, 59 S.Ct. 675, 83 L.Ed. 1071 (1939) (storage batteries). The same is true of actual sales of the invention. Maibohm v. RCA Victor Co., 89 F.2d 317, 320 (4th Cir. 1937) (electric switch); Callahan v. Nesbitt, 1 F.2d 75, 77 (3d Cir. 1924) (ventilating units); Application of Josserand, 188 F.2d 486, 38 C.C.P.A. 994 (1951) (commercial operation of theater drive-in for twenty nights).

■ The fact that some improvements are made or contemplated as respects the invention does not prevent its use from being public, provided that the improvement is only incidental to commercial operation. For example, in Root v. Third Avenue R. R. Co., 146 U.S. 210, 13 S.Ct. 100, 36 L.Ed. 946 (1892), it was held that where a cable railway was built, put into operation and used by the public, with no serious doubts as to its adequacy and no expectation of making any material change, there was a public use. See also, Thompson v. American Tobacco Co., 174 F.2d 773, 777–778 (4th Cir. 1949) (commercial use of tobacco feeder following experimental period held to constitute public use).

On the other hand, a number of cases have upheld bona fide experimental uses of invented machinery or devices.

"It is an undoubted principle of law that the experimental use of an invention by or under the control of the inventor for the purpose of testing or improving his invention is not a public use within the meaning of the statute." Bourne v. Jones, 114 F.Supp. 413, 419 (S.D.Fla.1951), aff'd, 207 F.2d 173 (5th Cir. 1953).

The leading case upholding the doctrine of experimental use is City of Elizabeth v. American Nicholson Pavement Co., 97 U.S. 126, 24 L.Ed. 1000 (1878). In that case the inventor of a new type of pavement constructed a 75 foot section of road embodying his invention on a public toll road. The paving was done at the inventor's expense and he made almost daily inspections of the road. The Court held that the construction and testing of the road under actual operating conditions was a bona fide experimental use designed to test durability and to bring the invention to

perfection. In National Tube Co. v. Steel & Tubes, Inc., 90 F.2d 52, 54 (3d Cir. 1937), it was held that the demonstration of several small pieces of tubing to show their fitness for use, without disclosing the process by which the tubing was made and preliminary to the execution of a sales contract, did not amount to a public use.

In this case the Court has come to the conclusion that what was done with the ENIAC prior to June 26, 1947 did not constitute a public use.

The intended purpose of the ENIAC machine was the computation of complicated ballistic firing tables. The machine was not put to this use until August 7, 1946, at which time calculation was made of a complete ballistic firing table (Hatch Problem No. 9) for a 90 mm. anti-aircraft artillery piece.

■ Earlier uses of the ENIAC machine were all in the nature of testing, checking, experimentation and evaluation. At no time prior to June 26, 1946 did the inventors or the institutions with which they were connected attempt to profit by or commercialize the ENIAC machine. Although the absence of profit does not conclusively negate a public use, it is an important consideration in such a finding. See Pennock v. Dialogue, 2 Pet. 1, 7 L.Ed. 327 (1829); Thomson-Houston Electric Co. v. Lorain Steel Co., 117 F. 249, 252 (2d Cir. 1902); Watson v. Allen, 103 U.S.App.D.C. 5, 254 F.2d 342, 345–347 (D.C.Cir. 1958).

The defendant's principal witness was Dr. Goldstine, a former captain in the Army Ordnance Department and now an employee of International Business Machines. In his affidavit he states that "from the time of the completion of the construction of the ENIAC by the first

of December of 1945, for as long as it remained at the Moore School, no changes, in the design, organization or cooperation between the different units were required or made." The defendant's affidavit is contradicted by affidavits of the inventors and by Mr. Homer W. Spence, a civilian employee of the Ordnance Department, who was responsible for the checking and testing of the machine prior to its acceptance by the Army.

The plaintiff Eckert testified by affidavit (Exhibit No. 76) that the process of checking or "debugging" continued at least until the time when Eckert left. the project in March 1946. Mr. Eckert further testified that to his knowledge no problem was run on the machine, prior to the time when he left, the answer to which was intended for practical use and that the machine was "prior to July 1946 in the checking and testing stage, in order to make the machine ready for acceptance."

The plaintiff Mauchly likewise testified by affidavit (Exhibit No. 75) that the problems that were run on the ENIAC machine in February 1946 were simply demonstration problems and were not checked for accuracy nor were they put to practical use.[6]

The affidavit of L. S. Dederick, who at the time here in question was a professional mathematician employed by the Army Ordnance Department, and who, on behalf of the Government, signed the document formally accepting the ENIAC, recites that he did not recommend acceptance by the Government of the ENIAC prior to July 25, 1946 "because it had not been adequately checked or tested prior to that date."[7]

Homer W. Spence, one of the engineers who checked the ENIAC prior to its ac—

---

6. Thus with reference to the Los Alamos problem, Dr. Goldstine stated in a letter to Dr. Dederick dated November 15, 1945: "It looks at the present time as if the ENIAC will be ready for testing on or about this coming Monday. It is our plan to run the Los Alamos problem at that time as a test of the workability of the machine."

7. Dr. Dederick stated: "I did not recommend acceptance by the Government of the ENIAC at a date prior to July 25, 1946 because it had not been adequately checked or tested prior to that date." (Plaintiffs' Exhibit No. 77).

ceptance by the Government stated in his affidavit that the checking which took place prior to that time was "in an effort to find manufacturing defects and that it was not merely routine maintenance." (Plaintiffs' Exhibit No. 78). Mr. Spence describes a number of manufacturing defects which were discovered and corrected and changes in design that were made between December 1945 and the acceptance by the Government on July 25, 1946.

The work done by the ENIAC machine on the Los Alamos problem was highly classified and the only two persons who knew the nature of the problem submitted affidavits that the results were not checked for accuracy and that there were almost certainly some undetected errors. The demonstrations which took place in February 1946 were based on an incomplete problem, programming errors were made in setting up the machine, the answers were not checked for accuracy and the answers were not put to any use. The fact that the public and press witnessed an experimental demonstration does not in itself make a public use. City of Elizabeth v. American Nicholson Pavement Co., 97 U.S. 126, 24 L.Ed. 1000 (1878).

The Court concludes that any use actually made of the machine prior to July 25, 1946 was an experimental use and not a public use within the meaning of 35 U.S.C. § 102.

This is not a case where the inventors did not press their patent claims with diligence. It appears that one attorney devoted his full time and another attorney and four draftsmen devoted their primary time to preparation of the application from the fall of 1945 until the application was filed on June 26, 1947. The application consists of five hundred pages of specifications and ninety-three sheets of drawings.

### The Issue of Patentability Other Than Public Use

Since both parties filed applications for patents on similar inventions there was not and is not now any issue between them involving the patentability of their respective applications save that of public use discussed above. There seems no reason for the Court to review the question of patentability any further, inasmuch as the Patent Office by its earlier grant of a patent to the defendant has recognized that the invention here at issue was a "new and useful" machine within the meaning of 35 U.S.C. § 101 and that it was not an obvious improvement in the prior art so as to be barred under 35 U.S.C. § 103. This aspect of the invention, which was favorably passed on by the Patent Office, is not contested and need not be further considered.

The Commissioner of Patents is directed to issue a patent to the plaintiffs on their application Serial No. 757,158 filed June 26, 1947, upon plaintiffs' further compliance with the requirements of law pertaining to such issuance.

This opinion shall constitute the findings of fact and conclusions of law of the Court.