34 C.C.P.A. (Patents)

**SHERMAN et al. v. HOPE (two cases).**
**Patent Appeal Nos. 5280, 5281.**

Court of Customs and Patent Appeals.
March 25, 1947.
Rehearing Denied May 16, 1947.

264

Marston Allen, of Cincinnati, Ohio (Paul Finckel, of counsel), for appellants.

Watson, Cole, Grindle & Watson, of Washington, D. C. (Robert C. Watson, of Washington, D. C., and Carl W. Weeks, of Niagara Falls, N. Y., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

BLAND, Judge.

The Board of Interference Examiners of the United States Patent Office awarded to the appellee, Hope, priority of the invention defined in five counts in Interference No. 80,584, Patent Appeal No. 5280, and priority of the invention defined in two counts in Interference No. 81,145, Patent Appeal No. 5281. Appellants, hereinafter referred to as Sherman, have here appealed from the board's decisions.

The board considered the issues in each of the interferences separately and wrote two opinions, requiring two appeals, which were argued together in this court. We will consider the issues in the two interferences separately but include them in one opinion.

Appeal No. 5280—Interference
No. 80,584

This interference is between Sherman's patent No. 2,291,658, issued August 4, 1942, on an application filed August 3, 1940, Serial No. 350,546, and appellee's application filed October 28, 1942, Serial No. 463,-625, a division of a previous application filed July 25, 1940, Serial No. 347,457.

The Sherman application was filed by his executors, Sherman having died some time in 1939 (the exact date of his death does not appear in the record). Hope copied the claims corresponding to the counts here in issue from the Sherman patent for the purpose of interference.

No testimony was presented on behalf of Hope, who relied upon his filing date, July 25, 1940, he thereby being senior to Sherman in filing date by nine days. The junior party, Sherman, took testimony in an attempt to show actual reduction to practice in advance of Hope's filing date.

The inventions of both parties relate to manifolding of multiple records upon which are kept written or typed indicia. The records are upon continuous paper strips, and usually strips of carbon are contained between such paper strips. The manifolding material, with the carbon, is longitudinally passed through an autographic register, a typewriter, a tabulating machine, or the like. In order that the strips will pass through uniformly, marginal feed holes extend through the strips of record material and carbon, and as the strips pass over a roller which contains feeding pins the pressure of the roller and the pins push the manifolding material through the machine. When the material has passed through the machine, the feed holes through the paper and carbon are regarded as somewhat unsightly and the purpose of the involved

inventions is to cut or remove from each side of the manifolding paper and carbon the feed holes so as to make the edges of the paper and carbon straight and uniform.

Of the five counts involved in this interference, count 1 is regarded as typical, and the controverted language in said count involves the "elongated cutter blade against which the strip is advanced by the pin wheel." This count reads: "1. In a strip trimming device, a rotary pin wheel, the pins of which have progressive engagement in a succession of longitudinally spaced holes in a strip of material for advancing the strip past a severing position, a peripheral groove in the pin wheel in parallel offset relation with the feeding pins, an elongated cutter blade against which the strip is advanced by the pin wheel, the extremity of which extends into the peripheral groove, the cutter being operative to progressively remove from the advancing strip a marginal portion thereof containing the succession of longitudinally spaced holes.

In the instant interference, the board held that the junior party, Sherman, had proven conception of the invention defined by the five counts in the first half of 1938, which is much earlier than any date to which appellee is entitled. The board held, however, that Sherman's evidence of reduction to practice was not satisfactory and that no diligence was shown and therefore found appellee entitled to priority.

The main question for decision here, as it was before the board, is whether or not Sherman has proved, by a preponderance of the evidence, that there was a reduction to practice in the year 1938, no other date for reduction to practice until his final filing date having been shown.

The activities which are relied upon by Sherman as evidence of conception and reduction to practice occurred in the first part of April, 1938. Sherman died in 1939 and the application with which we are here concerned was filed on August 3, 1940.

Sherman elicited the testimony of one witness, which testimony is contained in the instant record. Included as a part of the record also is a large volume of testimony in an interference entitled Mabon v. Sherman, Etc., Pat.App., 161 F.2d 255 decided concurrently herewith. We have not found it necessary to consult the testimony in the Mabon interference and no part of it was especially relied upon by either of the parties in the interference at bar. Certain other facts were by stipulation introduced into the record. All the above evidence and stipulated facts apply also to the companion interference, No. 81,145.

On the 10th day of May, 1944, one Forrest Aaron Briggs testified on behalf of Sherman. He stated that he had worked for the Standard Register Company at Dayton, Ohio (assignee of the Sherman cases herein involved), starting August 24, 1937, as an engineering designer, and that he continued to work for this company until March 17, 1942. He subsequently worked for another company and eventually went into the military service of the United States, in which service he was an Air Force officer at the time of testifying. He stated that when he was connected with the Standard Register Company, in the Engineering Department, he made a pencil sketch of a so-called "slitter device" which had been previously assembled and which he saw in operation in the experimental room of the plant. This pencil sketch was introduced in evidence as Sherman Exhibit 2. Briggs testified that he made this sketch from the actual device that he saw in operation; that he also made what he called an "assembly drawing" which was introduced as Sherman Exhibit 3, and also seven detail drawings which were made of the parts of the device after the assembly drawing had been made. These seven drawings were introduced as Sherman Exhibits 4-A, 4-B, 4-C, 4-D, 4-E, 4-F, and 4-G.

Briggs testified that Exhibit 2, the sketch he made of the machine when it was in operation, was made prior to April 2, 1938. He explained that the detail drawings bore dates as follows:

April 1, 1938—Exhibits 4-A and 4-E,
April 2, 1938—Exhibits 4-B and 4-F,
April 4, 1938—Exhibits 4-D and 4-G,

and that Exhibit 4-C was not dated. He stated that he placed the dates upon the drawings when completed, which practice he always followed.

He explained the operation of the device, which was driven by an Addressograph motor, and stated that the cutting blade was

a Schick razor blade, and he so described the structure as to conform in all material respects with the drawings of Sherman's patent application as filed August 3, 1940. These drawings clearly disclose the roller with the projecting pins which fit into the holes of the manifolding paper and the shearing or cutting element, which is a sharp, elongated cutter blade with an arm to hold the paper firmly upon the roller and with a notch or groove in the roller over which the paper passes so as to enable the cutter blade to sink down into the notch and thus cut the paper and carbon.

Briggs testified that when he examined the machine, as it was operated, for the purpose of making the drawings, and during the time its action was being demonstrated there were present other employees, Thomas Russell, Raymond Ratchford, and Grover Faehl, concerning the former two of whom it was stipulated into the record that, if present and called, they would testify: wholly from recollection that they were present when Forrest A. Briggs saw the slitter demonstration about which he testified; that they would corroborate Briggs' testimony as to the said demonstration; and that Russell would further testify that he has kept, and he would produce a Schick Ejector Blade taken from the pack of blades from which the blade used in the demonstration was taken; and that Ratchford would further testify wholly from memory that he built, assembled and operated in the manner stated by Briggs, the slitter device about which Briggs testified, such device being thereafter dismantled.

The testimony shows that upon completion of the original drawings a copy or reproduction of the same was given to the patent draftsman of the Standard Register Company, Arthur Gopperton. The stipulation provides that a certain letter referred to in the record, bearing date of April 11, 1938, addressed to J. Q. Sherman and signed by A. A. Gopperton, "shall be introduced into evidence as party Sherman's Exhibit 10." This letter describes the drawings, some of which have been alluded to above.

We quote as follows from the testimony of Briggs:

"Q–84. Was there paper in the machine when it was in operation when you saw it? A. Yes, sir.

"Q–85. What drove the machine? A. It was driven by an Addressograph motor, similar to one used on the carbon separator.

"Q–86. When you say an Addressograph motor, is that a motor that comes with the Addressograph? A. It is a part of the Addressograph.

"Q–87. What I am getting at. I understand there is a motor which comes with the Addressograph, and another motor which Standard Register Company puts on when they put their attachment on. Which type of motor was it? A. It was the motor which Standard Register used to put the attachment on. It had four rubber grommets in the feed that was mounted on studs.

"Q–88. What did the device which you have described do to the paper which was in the machine? A. It slit the paper.

"Q–89. Whereabouts did it place the slit in the paper? That is, on the center, or the side? A. Oh, it was on the side of the paper.

"Q–90. Which side, if you recall? A. It would be on the left hand side or the right hand side facing the front of the machine.

"Q–91. The right hand side facing the front of the machine? A. Facing the front of the machine.

"Q–92. Is the front of the machine the side which the paper is on before it goes to the machine, or afterwards? A. That is before leading up to and in under the feed fingers.

"Q–93. What was the purpose of this device on this feed, if you know? A. The purpose of the device was to remove a portion or a part of the paper, to remove the holes on the side.

"Q–94. Did the paper have marginal feed holes on both sides, or just one side? A. On both sides.

"Q–95. Did it remove these marginal holes successfully? A. Yes, sir, it did.

"Q–96. Did you state what kind of a blade was in the device? A. A Schick razor blade.

"Q-97. Is there more than one type of Schick razor blade? A. Not that I know of, sir.

"Q-98. Now, Lieutenant Briggs, after you made these drawings about which you have testified, that is Sherman exhibits 2, 3, 4-A to G inclusive, what did you do with them? A. Well, they were turned over, that is reproductions made from the original drawings was turned over to the experimental room, to the employees of the experimental room, for making the parts."

It will be noted that the witness stated that paper was in the machine when it was in operation and that the device "slit the paper" upon the side on which the slitting device was situated; also, that the paper had marginal feed holes on both sides. Then, in answer to the question, "Did it remove these marginal holes successfully?", he replied, "Yes, sir, it did." Then he stated the character of blade that was being used.

The board held that the evidence showed conception of the invention during the first half of 1938. This fact is not controverted with much enthusiasm in this appeal. The board further held, however, that the testimony was not sufficient to be accepted as proof of a reduction to practice. The board in part stated:

In view of the wording [in the stipulation referred to above] "they would corroborate Briggs' testimony", it is apparent that their stipulated testimony would have corresponding weaknesses as to the alleged success of the test.

The device was "thereafter dismantled" according to the stipulation, although a very considerable number of such experimental devices were kept * * *. Apparently no photograph of the device was available, as of the carbon separator (Exhibit 8). None of the paper run through the device was kept, * * *. These matters would appear to indicate that the machine did not particularly impress those who had charge of it.

Just what Sherman himself thought of the device does not appear in the record. It is urged that the letter Exhibit 10 was sent to him referring to an application on this device, but the letter is dated April 11, 1938 and his application was not filed until August 3, 1940. It is thus evident that he laid the matter aside for a considerable period. The evidence does not show that this was not due to an unfavorable opinion of the device, nor does it preclude the possibility that his executors, unaware of such an opinion, took up the matter after he died and completed and filed the application.

It is noted that the letter, Exhibit 10, bears a pencil notation, "Paper must pull past knife—knife must be at 'pin pulling point' or ahead of it for best results." This would seem to indicate that in other arrangements some difficulty was encountered. It is also noted that Figure 7 of Sherman's patent was apparently added to show a different form of the device where the knife was definitely ahead of the pins to avoid this difficulty.

The specification of the patent also indicates that "material of certain character" resists a straight thrust cut, or that lint may collect upon and clog the edge of the cutter * * *. Still another modification * * * is proposed to avoid these difficulties.

The meagre testimony previously quoted has nothing to say relative to the difficulties referred to in the two preceding paragraphs. Such details as the amount of paper used in the demonstration are not set forth, nor does it clearly appear what "successfully" meant to Briggs when he gave an affirmative answer to Question 95, which was leading. This answer is little more than a conclusion of the witness. In view of the situation presented here, where the device was dismantled, where there was a long delay after the demonstration before an application was filed, where other forms were apparently developed to obviate difficulties encountered with the original form, and where other circumstances pointed out above are present, it is deemed that testimony of the character previously quoted, is insufficient to establish that the device was satisfactorily tested (cf. Manny v. Garlick et al., 135 F.2d 757, 30 C.C.P.A., Patents, 1008, 553 O.G. 370, 1943 C.D. 419. It is therefore held that Sherman has not established a reduction to practice prior to August 3, 1940, his filing date.

The board then held that there was no evidence of diligence and therefore priority should be awarded to appellee.

It is at once apparent that the instant record presents a close question on the issue of reduction to practice. The situation might be quite different, however, if there was any circumstance which would tend to discredit the testimony of the experts in this art and it would present a different situation also if it were not shown beyond any reasonable doubt that Sherman is clearly entitled to a conception date of the invention defined by the instant counts long before the appellee entered the field. While it is not incumbent upon appellee to make Sherman's case he was present by counsel, who cross-examined Briggs at some length. Briggs stated that there was paper in the machine and that the cutting blade cut off the margin "successfully." While appellee's counsel was not obliged to interrogate him as to the details of the stated satisfactory results, it would seem strange for him not to do so if he had any reason to believe that the device did not perform properly.

Considering the device as constructed and operated, there is no reason to believe that it would not perform successfully, as the witness averred. The board stated that sometimes thick paper or lint on the paper would interfere with the operation of the knife. The razor blade employed as the cutter in the demonstration referred to was set at an angle and went down into a groove where it would seem certain that the knife would cut through any lint and would also cut through the paper and carbon.

The board, in its opinion, emphasized the delay of nearly two years before the application was filed, commenting, on this phase of the case, as follows: Just what Sherman himself thought of the device does not appear in the record. It is urged that the letter Exhibit 10 was sent to him referring to an application on this device, but the letter is dated April 11, 1938 and his application was not filed until August 3, 1940. It is thus evident that he laid the matter aside for a considerable period. The evidence does not show that this was not due to an unfavorable opinion of the device, nor does it preclude the possibility that his

executors, unaware of such an opinion, took up the matter after he died and completed and filed the application.

It should be noted that since Sherman died in the meantime the delay in filing the application is not an unreasonable delay under the circumstances, and certainly this is not the character of case where delay on the part of the applicant, after making a showing of reduction to practice, is regarded as having shown nothing more than an abandoned experiment. It must be remembered that the drawings which were largely the basis of the holding of conception on the part of the board were, for the most part, the identical drawings subsequently used in the Sherman application.

The board has commented upon the fact that the testimony is meager and that large portions of it were elicited by leading questions. It is true that the testimony would be much stronger if more of the details had been brought out with reference to the operation of the machine. However, the essential facts with reference to its operation are definitely stated, and we are of the opinion that Sherman's proofs make a prima facie case, particularly where he is laboring only under the burden of establishing his case by a preponderance of the evidence, and that a date of reduction to practice should have been awarded by the board to Sherman as of the first half of April, 1938. No diligence is therefore required since Sherman was the first to conceive and the first to reduce to practice.

Appellee has urged here without much enthusiasm (particularly in oral argument) that the record does not show that the real inventor was Sherman, and urges in effect that it was Sherman's burden to show that he was the inventor rather than some of the others engaged in working in the Sherman plant. It has been frequently held that it does not benefit a party in an interference proceeding to urge that the invention was by another and not by his opponent because, in any event, if an invention is shown to have been made prior to that of the contender, he, of course, could not be regarded as the first inventor. Hess v. Dreyfuss, 104 F.2d 801, 26 C.C.P.A., Patents, 1407, and cases therein cited. If this

subject matter is of concern at all it would be in connection with the ex parte consideration of the allowance of claims in a patent.

█ It follows from the foregoing that the decision of the board should be and is reversed.

Appeal No. 5281—Interference No. 81,145

This interference is between Sherman's application, Serial No. 350,545, which was filed August 3, 1940, and which was pending in the Patent Office when the interference was declared, and the aforementioned application of appellee involved in the companion interference.

The invention of both parties relate to the same general subject matter as is involved in the foregoing interference, although the counts here contain certain important limitations not found in the first interference.

The two counts involved are as follows:

"1. In a strip severing device, in combination, strip feeding mechanism including a part adapted to engage and feed a strip, said feeding mechanism including a rotary part having a peripheral groove spaced from said strip engaging part, a movably mounted support, *a strip guide connected to said support so as to be moved thereby to and from strip guiding relation with reference to said strip engaging strip feeding part of the feeding mechanism,* and a strip severing element adjustable into and out of strip severing relation in said peripheral groove. [Italics added.]

"2. In a strip severing device in combination, strip feeding mechanism including a part adapted to engage and feed a strip, said feeding mechanism including a rotary part having a peripheral groove spaced from said strip engaging part, a movably mounted support, *a strip guide connected to said support so as to be moved thereby to and from strip guiding relation with reference to said strip engaging strip feeding part of the feeding mechanism,* a strip severing element mounted for adjustment to and from strip severing relation in said peripheral groove, means for holding said movable support in adjusted operative positions, means for adjusting said severing element into different operative positions relative to said groove on said movable support, and a holding device for holding said movable support in position to retain said strip guide away from strip guiding position." [Italics added.]

It will be noted that the counts in this interference call for a "strip severing element," which is in that respect claiming broadly what in the companion interference was claimed in the form of an "elongated severing element." This feature of the counts will read upon a wheel as well as a cutting blade.

The critical element of the counts, as will hereinafter appear, is the limitation: "a strip guide connected to said support so as to be moved thereby to and from strip guiding relation with reference to said strip engaging strip feeding part of the feeding mechanism."

It was held by the board, in substance, that Sherman, at a date prior to appellee's filing date, had not established either conception or constructive reduction to practice of the invention defined by the instant counts for the reason that there was no disclosure in two earlier patents of Sherman of the structure defined by the above quoted limitation of the counts. The board said:

Sherman, whose filing date is August 3, 1940, has referred in his brief to two earlier applications which have become patents Nos. 2,172,414 and 2,252,734. Their disclosures are substantially the same, one being filed as a division of the other. Sherman's brief * * * urges that there is an unbroken continuity of common subject matter of these applications which supports the interference counts, but has not applied the counts to the disclosure of the earlier cases.

Both counts recite "a strip guide connected to said support so as to be moved thereby to and from strip guiding relation with reference to said strip engaging strip feeding part of feeding mechanism." In the Sherman application, this is the guide 53 which holds the strip in engagement with the feeding pins 9 when in the position shown in Figure 5. Figure 6 shows the strip guide in elevated position. The closest approach to this structure disclosed in

the earlier patents is the guide shown in Figures 13 and 15 cooperating with pins 13. This guide bears no reference numeral and does not appear to be referred to in the specifications. Figure 15 shows it mounted on a bracket, but no means is disclosed whereby it may be moved to and from strip guiding relation with the pins. It is accordingly held that the disclosures of the earlier Sherman patents fail to satisfy the limitation quoted at the beginning of this paragraph, and that Sherman has not established thereby either conception or constructive reduction to practice of the invention defined in the issue.

One of the earlier patents referred to in this quotation from the board's opinion is contained in the record in the Mabon v. Sherman interference hereinbefore referred to. The other patent is contained in the instant record.

There is very little argument in Sherman's brief to the effect that this particular limitation is disclosed in the earlier patents. He does contend that the patent involved in Interference No. 80,584 supports both counts. It does support both counts with respect to the limitation discussed in the prior interference but we are not prepared to agree that there is anything in that patent that supports the limitation above quoted.

In fact, when these counts are being considered in Sherman's brief he refers to the Sherman patent the filing date of which was subsequent to the record date of appellee.

We have examined the disclosures of the earlier patents and we can find nothing therein that we think supports this limitation of the counts and for that reason agree with the holding of the board that Sherman has proved no conception of the invention defined by the two counts in interference herein earlier than his filing date.

Sherman has not pointed to anything in either one of said patents responding to this critical limitation and the brief of appellee does not even refer to this subject matter in any way.

■ It is our opinion, and we so hold, that the board properly held that Sherman has not established conception of the inven-

tion defined by the two counts in issue and that priority was therefore properly awarded to the appellee.

We have examined the documentary exhibits relied upon by Sherman which disclose the knife as hereinbefore referred to in an attempt to find a disclosure of the structure defined by these particular limitations and we find nothing that responds to the same. But even if the board and we are in error about there being no such disclosure basis of the structure defined by these critical limitations, prior to Sherman's filing date of the application at bar, either in the patents or the original drawings to which we have referred in the previous interference, we feel certain that there was no reduction to practice of this particular feature because it is not shown by the testimony that when the machine was operated the function defined by this limitation took place. So if Sherman were awarded a conception date in 1938 of the counts here involved containing the limitation under discussion it would avail him nothing because there would be no reduction to practice established with respect to this particular feature.

Since our decision in the companion interference held the record sufficient to show conception and reduction to practice largely by reason of the testimony and the drawings which were concededly in existence before any record activity of appellee, it would follow that if such drawings, and the testimony, disclosed the elements of the counts which we are discussing and also showed reduction to practice of this feature we would be required to reverse the board in its decision awarding priority of the invention of the counts to Hope. Witness Briggs was asked the following question and made the following answer:

"Q-110. Will you tell me whether or not the movement of the arm about which you testified moved both the guide and the cutter to and away from the paper on the feeding device? A. Yes, sir, it did, or would.

While the meaning of the limitation now under consideration is not as clear as it might be, we feel that the question and answer above set forth does not show that the structure of the device which the witness

was describing was shown as being capable of movement in accordance with the limitation. It may be that the movement of the arm was up and down, "to and from strip guiding relation," or it may have been it was movable sideways so as to permit adjustment for different widths of paper. So the disclosure of the feature now under consideration is not satisfactory and certainly there is no testimony with respect to reducing this feature of the invention to practice.

It may be that the machine containing the slitter device here in controversy, operated in 1938, was so constructed that the strip guide would perform in the manner described in the limitations under consideration. It is not unreasonable to suppose that some such structure was in contemplation for the purpose of being adjusted to different kinds of paper. However this may be, there is no showing to this effect, nor is there any description of such a movement contained in the record which shows the existence of such a device, or its successful operation, early enough to be of avail to Sherman.

It follows from the foregoing that the decision of the board in this interference is affirmed.

The decision of the Board of Interference Examiners in Interference No. 80,584, Patent Appeal No. 5280, is reversed, and its decision in Interference No. 81,145, Patent Appeal No. 5281, is affirmed.