**Gilbert R. WOLTER, Alfred F. Ernstberger and Frederick J. Ritter, Appellants,**

**v.**

**Michael E. BELICKA, Robert J. Kenny and Rodney Longin, Appellee.**

**Patent Appeal No. 8038.**

United States Court of Customs and Patent Appeals.

April 17, 1969.

**256**

George R. Clark, Mason, Kolehmainen, Rathburn & Wyss, Walter Lewis, Walther E. Wyss, M. Hudson Rathburn, Chicago, Ill., attorneys of record, for appellants.

Watson, Leavenworth, Kelton & Taggart, Elmer R. Helferich, New York City, for appellees; Thomas C. Betts, New York City, of counsel.

Before WORLEY, Chief Judge, and RICH, SMITH, ALMOND and BALDWIN, Judges.

WORLEY, Chief Judge.

■ The issue here is whether Wolter, Ernstberger and Ritter (Wolter) *have proved beyond a reasonable doubt* [1] that there was a successful reduction to practice of their invention before the July 18, 1961 filing date of patent No. 3,101,505 of the senior party Belicka, Kenny and Longin (Belicka). The Board of Patent Interferences found that Wolter had not discharged his burden of proof and awarded priority to Belicka. We find nothing from our re-view of the record to support appellants' allegation of reversible error and affirm the board's decision.

The invention is defined by counts 1 through 9 as a "floor care machine." The board treated count 1 as typical. That count, separated into its elements, reads:

1. In a floor care machine,
    (a) a frame,
    (b) an electric motor supported on said frame,
    (c) rotary surface treating means below said frame and driven by said motor,
    (d) a manipulating handle pivotally connected to said frame,
    (e) a cleaning liquid tank removably mounted on said handle,
    (f) means for conveying liquid from said tank to the floor adjacent to said rotary means,
    (g) a liquid pick-up suction nozzle depending from said frame,
    (h) a fan driven by said motor,
    (i) conduit means for connecting the inlet of said fan to said nozzle,
    (j) a waste liquid tank interposed in said conduit means and removably mounted on said handle, and
    (k) means in the last-mentioned tank for separating liquid from the air passing therethrough.

Wolter describes the remaining counts as calling for:

\* \* \* one or more additional features or variations such as inclusion of a rinse water tank selectively connectable to the liquid conveying means or the provision of a squeegee in or associated with the suction nozzle or the provision of a liquid wax reservoir, together with means for conveying the liquid wax to the floor, or in the provision of a manifold for the lower ends of the cleaning liquid and

---

1. The burden of proof is beyond a reasonable doubt because the Wolter application, in which the counts were copied from the Belicka patent, was filed August 3, 1964, which is subsequent to the August 27, 1963 issue date of said patent. See Conner v. Joris, 241 F.2d 944, 44 CCPA 772 (1957).

waste liquid tanks or for valve actuating means carried on the handle.

In further explanation of the invention, Wolter states, with citations of record pages omitted:

> The objects and advantages of the floor-conditioning apparatus defined by the issue counts are stated in the Belicka et al. patent as the provision of:

> "* * * a surface treating machine and more particularly to a relatively small machine of this type suitable for use in a home by the housewife."

> * * * * * *

> "* * * a machine having one or more rotary scrubbing elements for contacting a floor, together with means under the control of the operator for feeding a detergent liquid to the floor in the neighborhood of the scrubbing means in combination with a wet pick-up arrangement whereby the detergent and dissolved dirt may be removed from the floor, leaving the latter practically dry."

> * * * * * *

> "* * * means also under the control of the operator for supplying rinse water or the like to the floor in the neighborhood of the scrubbing means in order that any remaining traces of detergent may be diluted thereby, the water pick-up means then serving to remove the rinse water from the floor."

> * * * * * *

> "* * * removable reservoirs for holding the liquid detergent and the rinse water and a removable container for accumulating the liquid which is picked up, * * * easily removable from the rest of the apparatus in order that they may be independently carried to a sink or the like for convenience in filling and emptying."

> "* * * a liquid wax reservoir, also easily removable from the rest of the apparatus * * *" and

> * * * * * *

> "* * * means under the control of the operator for applying liquid wax to the surface in order that the device may also serve as a floor polisher."

Belicka is restricted to his July 18, 1961 filing date for conception and reduction to practice since he submitted no evidence of earlier activities.

The evidence on behalf of Wolter includes testimony of Wolter, Ernstberger and Ritter, as well as seven others— Clowers, Jepson, Vander Velde, Lewis, Thrams, Hegerich and Neben—who were employed by their assignee, Sunbeam Corporation,[2] at the time under consideration. Also submitted were certain physical and many documentary exhibits, in total number 278. The documentary exhibits, in large part, are drawings showing the construction of two models of the machine and their components discussed hereafter.

Wolter's case is predicated primarily on a floor care machine, or scrubber, introduced as Exhibit 5. More specifically, the Wolter brief states that the "sole question" presented to us is "whether or not the proofs adduced by the party Wolter et al. sufficiently establish successful operation of the floor conditioning apparatus" of that Exhibit "to constitute a reduction to practice of the subject matter of the issue counts prior to July 18, 1961." It is unquestioned that a machine was built and tested prior to that date, and that it meets the terms of count 1 and nearly all of the other counts.[3]

---

2. The Belicka patent was owned by Electrolux Corporation during proceedings in the Patent Office, but has since been assigned to Consolidated Foods Corporation.

3. It does not appear from the record and briefs that Belicka raises any question of Exhibit 5 failing to meet all the counts. At oral argument, however, counsel for Belicka seemed to question whether references to a "cleaning liquid tank" and "rinse water" tank in claim 2 and reference to a wax reservoir and means for conveying wax to the floor in count 6

Wolter, Ernstberger and Ritter all testified that they operated the Exhibit 5 machine. However, the board stated regarding their testimony (references to the record omitted):

* * * none of them *clearly stated* that it performed the function primarily intended, namely clean a floor. Ernstberger * * * stated in reference to entries on a project log sheet (exhibit 156) that the machine did everything expected, that he scrubbed a floor, and that it picked up water. As to this self-serving testimony there is no evidence as to the initial and final condition of the floor. Ritter testified * * * substantially in the same manner as Ernstberger. Wolter testified that he operated the machine of exhibit 5 but his testimony rather than indicating successful operation indicates the contrary. He testified that the laboratory found objections to the methodology of the design * * * and they were not satisfied with the provisions for separating dirty water from clean, and for separating foam from the air * * *.

The board next discussed Exhibit 157, a report of *laboratory tests* on the machine of Exhibit 5. It noted that Spano and Heider, who conducted the tests, did not testify although they were still employees of Sunbeam. It acknowledged testimony of Neben, the supervisor of Spano and Heider, that he read and approved the results of the tests but found his testimony "devoid of actual observance of the tests." It regarded "acceptance" of the reported test results by Neben as inadequate "to prove a reduction to practice. Kear v. Roder, 28 CCPA 774; * * * [115 F.2d 810, 47 USPQ 458]." The board further stated:

The party Wolter *et al.* appears to be arguing that Exhibit 157 comes within the purview of the Federal Shop Book Rule 28 U.S.C. 1732. This

rule was not intended to apply to laboratory test notes. Alpert v. Slatin 49 CCPA 1343; * * * [305 F.2d 891; 134 USPQ 296].

The testimony of the other witnesses regarding the *testing* of Exhibit 5 was discussed by the board as follows:

The corroborating witnesses Clowers, VanderVelde, Jepson and Hegerich all testified they saw the machine of exhibit 5 in operation but their testimony singly or collectively does not prove a reduction to practice. Clowers testified * * * that he saw liquid dropped and picked up by the machine, however he gave no testimony as to the condition of the floor or whether it was in fact cleaned. The testimony of VanderVelde is similar. Jepson testified * * * that as far as he could recall it did a good job of scrubbing the floor and picking up water. But we have no information as to the condition of the floor before and after scrubbing. If the machine were operated on a clean floor it would not be possible to determine if the machine performed its intended cleaning function or not.

The letter (exhibit 277) written by the witness Hegerich merely describes the operation in superlatives but is silent as to the conditions of the floor besides stating that the floor was dried satisfactorily. His oral testimony was uncertain as to the identity of the machine he actually saw operate. We further note that the last line of the third paragraph of exhibit 277 refers to a water pump. Neither of the models exhibits 5 and 45 have a water pump as such, but the earlier model, exhibit 82, did have such a pump * * *. Furthermore, the uncorroborated test report (Exhibit 157) at p. 7, third paragraph does not support the glowing first paragraph of exhibit 277.

The board also considered testimony regarding tests of a second model of

found compliance in Exhibit 5. In the view we take of the case, further treat-

ment of those assertions becomes unnecessary.

the Wolter machine, Exhibit 45, which were completed after Belicka's filing date. The board found that testimony also inadequate to prove Wolter's case, characterizing it as "substantially the same as that relative to exhibit 5." The board thought it significant that, after certain home tests of Exhibit 45 were completed about November 6, 1961, no further evidence of activity with respect to the project number under which the physical exhibits were made appears in the record until a memorandum of March 1, 1963. In that memorandum, Jepson, who was in charge of research and development at Sunbeam for a long period prior to his retirement in 1963, advised Sunbeam patent attorney Lewis that Wolter, Ernstberger and Ritter were the inventors of the "Suction Floor Scrubber."

Wolter emphasizes favorable comments regarding the tests of Exhibit 5 by the inventors and other witnesses as demonstrating reduction to practice. At oral argument, he also stated that he now relies on the test report designated Exhibit 157 as proof of tests of Exhibit 5 amounting to a reduction to practice, specifically retracting a statement made in his brief.[4]

The basic question here is whether the combination of elements of the invention as defined in the counts was shown to have operated in the manner contemplated to successfully provide the intended result. In determining that question we must consider all the evidence, including not only that pointing to successful operation of Exhibit 5 relied on by Wolter, but also the statements in the testimony which point out unfavorable aspects of the test results.

The most specific testimony on the test results was given by the inventor Wolter, who was a division manager at

Sunbeam and Ernstberger's immediate superior. He testified:

Q. 150. After this one [Exhibit 5] was completed, what happened then? A. It was tested and, primarily in our laboratory, and found a few objections to the methodology of the design, and as is usually the case, we finished the test work and designed the next subsequent one which was this one [Exhibit 45].

\* \* \* \* \* \*

Q158. I believe you testified you used Exhibit 5. A. Yes.

Q159. Were you satisfied with its operation? A. Not entirely. Do you want me to go into detail on it?

Q160. If you can remember something that you thought. A. Well, functionally it seemed to work fairly well. We were not entirely satisfied with our water separation as I recall in this unit. We were not satisfied with the hose arrangement. We had developed a hose within a hose. The problem of separating dirty water from clean, and the problem of separating foam from the air was not entirely satisfactory in that unit.

\* \* \* \* \* \*

RDQ3. Did you use Exhibit No. 5? A. Yes.

RDQ4. Did it pick up water? A. Yes.

RDQ5. Did it scrub? A. Yes.

RDQ6. When it picked up water, what kind of floor was left after the water pick-up sequence or operation? A. We were striving for an absolutely dry floor as our goal and we were getting some streaking. So far as the nozzles were concerned, I believe that was our only complaint. We were trying to do a pure job on the floor. In the area of the water separation,

---

4. The retracted statement appears as a footnote in the brief reading:

While there is no contention here that Exhibit 157 itself constitutes proof that the tests there reported were sufficient to establish reduction to practice of Ex- hibit 5, this exhibit was positively identified as to date and authenticity by the witness Neben (R. 450–453) and establishes and corroborates the date or dates upon which Exhibit 5 was tested.

the problem of being sure we were separating the water from the air was the major problem.

Ernstberger was less specific. His evidence included a written statement that the scrubber "did everything expected" and testimony that the testing of Exhibit 5 "showed us our ideas were feasible and workable."

Ritter stated that he scrubbed floors with the unit and that it "worked very well." However, he did not specify that the machine deposited cleaning fluid, deposited rinse water, and picked up the rinse water or explain details of what he regarded as working "very well."

As to corroborating testimony, both Clowers, who prepared drawings for Exhibits 5 and 45, and Jepson, who had charge of research and development, were generally favorable in their comments as far as they went. Clowers testified that the machine deposited water, scrubbed and sucked up water, but made no comment whether the floor was clean or dirty before and after the operation or ended up in a dry condition. Jepson's testimony includes the following with respect to his operation of Exhibit 5:

Q30. Did you think it did a good job of scrubbing the floor and picking up water? A. Well, it did a good job so far as I can recall, but I know there was quite a few little details that I thought should be improved on, but in general I thought the principle was sound.

The testimony of Hegerich, a sales manager for Sunbeam, relates to a letter dated March 8, 1961 in which he stated he had watched a demonstration of a floor polisher-scrubber which " * * performed beautifully" and in which the "dispensing, scrubbing, etc. was deluxe in every respect." While he did not amplify those statements in his testimony or describe the conditions of operation, he did state that he believed the machine referred to was Exhibit 5.

The most important remaining evidence is the test report identified as Exhibit 157. That report relates to tests Ernstberger requested the Sunbeam testing laboratory to make of a General Electric floor scrubber, a Hoover floor scrubber and the Sunbeam machine in evidence as Exhibit 5. The manager of the laboratory, Neben, testified that the test work covered by the exhibit was done by Spano and Heider with the entries in the report made by Spano. Neben testified that he assigned the work and read and approved the results of the tests, but did not state that he actually observed the tests. While there is a controversy as to the status of this report under the Federal Shop Book Rule, 28 U.S.C. § 1732, we will treat it for present purposes in the light urged by Wolter as evidencing that tests were carried out with the results reported representing the experimenters' findings.[5] The report describes the cleaning ability of all three units tested as good from a visual viewpoint, stating further:

Visually the floors looked identical and clean. A glossmeter was used to further evaluate the cleaning ability of the subject floor scrubbers. In using the glossmeter, it was found that the Hoover and Gen. Elect. units came out a little better than the Sunbeam unit. All units left streaks of a dirty residue. The streaking effect of the Sunbeam unit was greater than the Hoover and G. E. This could be due to the curved nozzle which cocks when the unit is moved.

It was found that the Sunbeam unit dried the floor better than the Hoover and Gen. Elect. because of its squeegee action.

5. Apparently as a consequence of Wolter's last minute reversal of the position taken in his brief regarding the significance of Exhibit 157, as discussed previously, neither party has provided such full argument or citation of authority on the question of the applicability of the Federal Shop Book Rule as we would wish. For that reason, and because the result we reach makes it unnecessary to do so, we do not specifically decide that point.

Referring specifically to the Sunbeam machine (Exhibit 5), the report added:

> The floor looked clean *except* for a few streaks visible. The blot test showed the floor to be clean *except* where streaks occurred.
>
> The unit is easy to handle *except* at times it has a tendency to pull away.
>
> Water pickup performance is better on the *forward stroke* with only slight streaking. Maximum streaking occurs on the *back stroke*. Although after having picked up water or scrubbing solution from the floor, when unit is turned off there occurs *spill-back through the rear squeegee*. This spill-back when having picked up dirty scrub water *causes the clean rinse water applied to the floor to become dirty* and is responsible for pronouncing the streaks left after rinsing. [Emphasis supplied.]

Considering in its entirety the evidence regarding the tests of Exhibit 5, we, like the board, are not satisfied that the machine responded to the tests in such manner as to demonstrate beyond a reasonable doubt that its operation amounted to a successful reduction to practice. Thus the inventor Wolter was not entirely satisfied with the hose arrangement or the separation of dirty water from clean. Also he did not regard the separation of foam from air to be entirely satisfactory and he complained of streaking, making reference to the nozzles.

The report of Exhibit 157 tends to confirm the difficulties observed by Wolter. In particular, the statements therein that there was a streaking problem which "could be due to the curved nozzle" or squeegees, and that spillback of dirty water through the rear squeegee which was responsible for "pronouncing the streaks left after rinsing" indicate a performance problem which brings into

serious question the successful operation of the invention.

The doubts raised as to the performance of Exhibit 5 are significant since Sunbeam subsequently commenced assembly of Exhibit 45 designed to correct the deficiencies in Exhibit 5. Thus the Exhibit 45 machine was provided with straight squeegees for removing the water from the floor. Also the "hose within a hose" arrangement for sucking the water through the squeegees and then carrying air separated from the water back to the fan was eliminated in favor of two separate hoses with a different air-water separator structure comprising a plurality of baffles therebetween.[6] The changes embodied in the Exhibit 45 machine thus appear to have been directed to seeking a cure for the very problems and shortcomings which the tests revealed in Exhibit 5.

Since Wolter so frames the issue in his brief as to exclude reliance on the Exhibit 45 machine itself for reduction to practice, as we have already noted, the tests of that machine need not be analyzed. Moreover, the record shows that those tests took place after Belicka's filing date and Wolter does not point out how his evidence might prove diligence throughout the critical period beginning just prior to that filing date.

In our consideration here, we have not overlooked the evidence favorable to Wolter's position that the results of the tests of Exhibit 5 show satisfactory operation amounting to a reduction to practice. However, that favorable evidence is largely in terms of generalities and conclusions. In our opinion, the more specific evidence of dissatisfaction with identified phases of the operation outweighs that favorable evidence, at least to the extent of raising what we are satisfied is reasonable doubt that Exhibit 5 was reduced to practice. As noted at the outset, it is the heavy burden of proving his case

---

6. The significance of the modified elements to the invention in issue is apparent from reference to elements (g), (i), (j) and (k) of count 1 as set out earlier in this opinion.

beyond a reasonable doubt that Wolter must meet.

■ We have also considered Sherman v. Hope, 161 F.2d 263, 34 CCPA 980 (1947), cited by Wolter. That case does indicate that a party might be expected to challenge testimony that a device operated "successfully" by way of cross-examination where there is no reason in the record to believe that the device did not perform properly. However, we are not convinced that any implication adverse to Belicka should be attached to the absence of more detailed cross-examination of Wolter's witnesses in the present case where the distinct possibility of less than successful operation of Exhibit 5 is clearly revealed in the direct testimony, and the burden of proof on Wolter is beyond a reasonable doubt.

The decision is affirmed.

Affirmed.

Judge SMITH participated in the hearing of this case but died before a decision was reached.

RICH, Judge (dissenting).

The question here is actual reduction to practice. The majority opinion, however, utilizes the legally meaningless concept of "a *successful* reduction to practice" * (emphasis added), which does not appear in the language of the relevant statute, 35 U.S.C. § 102(g). There are no degrees of "reduction to practice"; either one has or has not occurred.

In determining whether reduction to practice has or has not been achieved, it is, of course, correct to consider whether acts performed in furthering the development of an invention were successful in achieving the object sought. Once it has been determined that the facts show successful testing, however, then the decision on reduction to practice and of priority of invention, pursuant to the statute, flows automatically therefrom and does not depend upon a characterization of the reduction to practice as "successful" or "unsuccessful." Reduction to practice is a legal conclusion which flows from successful testing. There is no such thing as an "unsuccessful reduction to practice." The only question here is whether the test *results*, proved beyond a reasonable doubt, meet the *legal* requirements for an actual reduction to practice.

As correctly noted in the majority opinion, the burden of proof appellants must meet here is "beyond a reasonable doubt." This burden, however, runs only to what facts appellants must show to establish success of the invention and not to the process of arriving at the legal conclusion of reduction to practice to be drawn from those facts, once established. In the majority opinion this stiff burden appears to have been applied not only to the facts but, as an *additional* requirement, to the legal inference to be drawn from them. As a result, appellants have been required not only to make a better than normal *showing* of the facts relied upon but, as the majority has applied the test, have also been required to show better than normal *facts*. "Normal" is here used to refer to the heretofore existing legal requirements which we should follow. The effect here has been that appellants have been required to prove a higher standard of operative perfection of their invention, namely *commercially* satisfactory operation, than has been normally required to establish reduction to practice. Such a result is clearly inconsistent with decisions by this and other courts that less than perfect operation will establish reduction to practice, e. g., Kravig v. Henderson, 362 F.2d 1015, 53 CCPA 1534 (1966); Eastern Rotorcraft Corporation v. United States, 384 F.2d 429, 181 Ct.Cl. 299 (1967); Schnick v. Fenn,

* Although this expression appears in Land v. Regan, Jr., 342 F.2d 92, 52 CCPA 1048 (1965), at [4], the context clearly shows what was there intended by "*suc-* *cessful* reduction to practice" (emphasis added) was "*actual* reduction to practice."

277 F.2d 935, 47 CCPA 1174 (1960); and Leichsenring, Jr., v. Freeman, 103 F.2d 378, 26 CCPA 1153 (1939).

In *Leichsenring*, for example, a hydraulic automobile braking device tested had been shown to hold the vehicle stationary even though it was an admitted fact that a leakage of brake fluid occurring when the brakes were applied would, after a while, result in release of the brakes. Although this defect in a vehicle brake system might seem to some a more serious failing in relation to the respective inventions involved than the presence of some streaking by a floor care machine, the court in *Leichsenring* held, in unanimously reversing the Patent Office, that there was a reduction to practice, stating:

> The question is, did the tests demonstrate the device to be successful? That Exhibit 2, in the condition in which tested, *would not have been commercially satisfactory* is obvious, but *it is well settled that there may be a reduction to practice by use of a device not commercially successful.* * *
>
> * * * * * *
>
> It was clearly demonstrated, we think, that appellant's device *involved the generic principle, and that it worked for a sufficient period of time to show that the application of the principle solved the problem.* * * *
> [Emphasis added.]

Similarly in our more recent *Schnick* case in which we found reduction to practice of a cigar-lighter invention despite the fact that the test results would *not* have warranted production of the lighter at that time, we said:

> It must be remembered that Fenn and his associates were extremely experienced in this field and *once they found the basic concept of the invention to be sound* by testing it their principal concern was dissipated because they knew that the refinements necessary to perfect a commercially acceptable device could be made in the usual course of preparing it for mass production. * * *
> [Emphasis added.]

In *Eastern Rotorcraft* a unanimous seven-judge United States Court of Claims said:

> Reduction to practice occurs when the *workability* of an invention can be demonstrated. Workability means that a physical form of the invention has been constructed *which functions.* * * * And this requires testing the invention. * * * the inquiry is not what kind of test was conducted, but whether the test conducted showed that the invention *would work* as intended in its contemplated use. * * Proof of the invention's utility for its intended purpose *does not require proof of its flawlessness*; it is only necessary to show that the invention is able to perform its intended purpose beyond a probability of failure. [Emphasis added.]

Most of the several cases relied on in but omitted from the above quotation are decisions of this court.

The rationale of prior decisions is that if tests show that the device tested functions in such a manner as to demonstrate *the soundness of the principles of operation* of the invention, then there has been a reduction to practice, even though continued refinement of the device within the skill of the art is necessary before the invention is in a commercially exploitable form.

Turning to the present case, the correct approach, therefore, is to apply the "beyond a reasonable doubt" test only in determining whether the facts proved by record evidence showed that appellants established the soundness of the principles of operation of their machine, Exhibit 5. Once the facts have been established, it follows as a legal conclusion that there has been a reduction to practice of the invention.

Considering, first, exhibit 157, it will be assumed, arguendo, that it is not available to appellants as evidence to show what it reports. Even without the benefit of exhibit 157, however, there is adequate testimony in the record to show facts from which a conclusion of reduction to practice follows. The testi-

mony to be considered divides into two aspects: (1) what operations were performed by the Exhibit 5 device and (2) whether the tests on the Exhibit 5 device show the soundness of its principles of operation. As the majority states, it is not questioned that Exhibit 5 meets the terms of most counts, was built, and was tested at an early enough date.

The operations performed by the Exhibit 5 device in the period about January 1961 are described with relation to the functions that were carried out during operation of the device by the witness Clowers, as follows:

Q38. When you first saw this unit, Mr. Clowers, did you see anyone operate it, or have you ever operated it yourself, and about when did that happen? A. As I recall, it was approximately the two month date after I started [November 1960]. *The machine was operated. Liquid was dropped from the containers and it was also picked up with these squeegees.*

Q39. Where was this done, if you recall? At someone's home, or where? A. The demonstration I saw was down in our room where we work downstairs where the Motor-Operated Appliances Division is on the first floor.

Q40. Do you remember who was doing the operating? A. Both Mr. Ernstberger, Mr. Ritter, and myself.

Q41. Mr. Clowers, could you look at this unit closely and tell us if you remember it as being the same unit that you saw after you started to work here? A. Yes, I would say so, because of this tube here. As I recall, there was only one model of this made. Perhaps there were more, but I didn't see them. I only saw this one. This is the one I saw.

Q42. This the machine you saw? A. Oh yes, the silicon—rubber—definitely the identical machine I saw. The epoxy, of course, was hand work.

Q43. Did you ever operate the machine? A. At this time I operated this machine.

Q44. Did you understand its parts when you operated it and its mode of operation? A. Yes, I did. As I recall, it was very easy to control. It was like our standard floor conditioner.

Q45. Could you quickly tell us *how it did operate at that time?* A. To dispose the water, this control was used up on the handle here with this tank assembled. When this is brought back, this lever comes up and activates the valve which drops *water into this trough which was disposed into a tube onto the floor.* With the motor running and *the brushes rotating, they would scrub the floor.* This had to be rotated if you wanted soap. A cam rotated by hand would allow soap to flow into the channel and mix with the clean water on the floor. As it scrubbed, by activating this lever here—

Q46. A foot lever? A. A foot lever, we could drop the two squeegees onto the floor and then *a vacuum would pick up the water* that was brushed and squeegeed by the rubber blades. That would suck this up through the tube and deposit it in the tank.

Q47. Could you tell us the suction path? A. These two come together at the point that we see here.

Q48. In this Y-shaped fitting? A. In this Y-shaped fitting. This in turn is the return of the air coming through.

Mr. Lewis: I can see we have taken this apart.
*By the Witness:*

A. (Continuing) We are taking the vacuum from the motor through the larger tube.

In turn this is being pushed up by atmospheric pressure into the tube on the tank. The large tube is clean air; the small tube carries the dirty water and air mixture.

*By Mr. Lewis:* Q49. After the dirty water came up into this small tube, where would it go? A. It

would hit this surface here and be deflected downwards.

Q50. This clear surface of plastic? A. Yes, the water and air mixture. It would be directed down so it didn't splatter back into the clean air system. *This way the water would be deposited in the bottom and the air was free to come back up and flow through here and return.*

Q51. Where would the waste water, the dirty water be stored? Where would you get this fresh water or cleaning water? A. The clean water would come from this valve, which also comes loose so you can refill this container. The dirty water was deposited through here and also had to be emptied from this same opening in this fashion. This part snapped into here and fits back, being held in place by the upper member. It also is guided by the member that is keyed to fit in there. [Emphasis added.]

It can be observed from this testimony by a witness who was neither one of the inventors nor an employee of Sunbeam at the time of taking the testimony, that the Exhibit 5 device in January 1961 performed the operation to be expected of a device meeting the limitation of count 1, namely depositing water on the floor, scrubbing the floor, picking up the water by vacuum, and separating the water from the air.

It follows that the next question to be decided is whether Exhibit 5, functioning in this manner—and there is nothing in the record that would indicate that it might have any different range and sequence of operations when operated by other people than Clowers —satisfactorily demonstrated the soundness of the principles of operation underlying the invention. The co-inventor Ernstberger stated:

Q375. This unit [Exhibit 5] that your entry says was finished on January 13, 1961, did you use the unit personally? Did you scrub a floor with it? A. Oh, yes.

Q376. Did you pick up water? A. Oh, yes.

The co-inventor Ritter stated:

Q213. Was the unit finished when you stopped working on it? A. Yes, I could demonstrate its working features.

Q214. Did you use it? A. I many times demonstrated it to various people who either supervised me or have an interest in it.

Q215. Did you scrub any floors with the unit? A. I did many times.

Q216. Did it work well? A. It worked very well.

In addition, the co-inventor Wolter, who also operated Exhibit 5, testified that the unit also functioned fairly well despite certain imperfections, thus:

Q151. Do you have any recollection of operating this unit, No. 5? A. Yes.

Q152. Do you have any recollection of demonstrating this unit to anyone? A. Yes.

Q153. Could you remember to whom you demonstrated it? A. Well, again I am sure Mr. Jepson is one. I believe Mr. Hegerich, and possibly Mr. Lee.

\* \* \* \* \* \*

Q159. Were you satisfied with its operation? A. Not entirely. Do you want me to go into detail on it?

Q160. If you can remember something that you thought. A. Well, functionally it seemed to work fairly well. We were not entirely satisfied with our water separation as I recall in this unit. We were not satisfied with the hose arrangement. We had developed a hose within a hose. The problem of separating dirty water from clean, and the problem of separating foam from the air was not entirely satisfactory in that unit.

Q161. What about the cost of this unit? Did you have any attitude about the cost? We felt it was too high. Our goal was lower than we thought this would come out to be. Actually, concerned with cost at this point, being a breadboard, we weren't too but concerned with function.

Corroboration is supplied by Jepson and Hegerich identified in the above testimony of Wolter. Jepson's testimony included:

Q27. Mr. Jepson, Exhibit No. 5, did you see it in operation at all after it was completed? A. Yes, I am sure I did.

Q28. Did you operate it at all? A. Yes.

Q29. Can you remember if you used it? A. Yes. I did use it.

Q30. Did you think it did a good job of scrubbing the floor and picking up water? A. Well, it did a good job so far as I can recall, but I know there was quite a few little details that I thought should be improved on, but in general I thought the principle was sound.

Hegerich, in a letter written on March 8, 1961 (Exhibit 277) wrote:

"Some weeks ago I watched a demonstration in R & D on a deluxe floor polisher—scrubber and water vacuum. This working model performed beautifully. The dispensing, scrubbing, etc. was deluxe in every respect. The water vacuum was superb and dried the floor very satisfactorily. Unlike all the other water vacuum competitive units I've seen demonstrated, this unit did the job.

"In my opinion, this unit should be our deluxe floor conditioner and water vacuum."

Moreover, Hegerich's letter recommended that the project be pushed ahead and expedited with a target date of March 1962 for marketing, a step which he would hardly have taken had he just observed a test of a device which was a failure.

The foregoing testimony of the numerous inventors and corroborating witnesses establishes beyond a reasonable doubt that the tests of Exhibit 5 showed to the satisfaction of all who observed them that the device demonstrated the soundness of the underlying principles of operation of the invention, and that though there may have been some imperfections they were only such as could be eliminated in the usual refinement of a prototype device into a commercially salable embodiment.

Applying to the fact situation thus established the rationale of the *Leichsenring* and other cases previously discussed, a legal conclusion of reduction to practice necessarily follows.

Accordingly, as I find that appellants reduced their invention to practice prior to the appellees' filing date and are, therefore, entitled to an award of priority, I would reverse the decision of the board.